COLORADO COURT OF APPEALS                              **2017COA56**

Court of Appeals No. 09CA2784
Arapahoe County District Court No. 07CR1483
Honorable Valeria N. Spencer, Judge
Honorable William B. Sylvester, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Aaron Duane Thompson,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE BERNARD
Webb, J., concurs in part and specially concurs in part
Dunn, J., concurs in part and dissents in part

Announced May 4, 2017

Cynthia H. Coffman, Attorney General, Jillian J. Price, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Keyonyu X. O'Connell, Alternate Defense Counsel, Denver, Colorado; Lynn C.
Hartfield, Alternate Defense Counsel, Denver, Colorado, for Defendant-
Appellant

¶ 1    This appeal poses a question of first impression in Colorado: Do indigent defendants in criminal cases have (1) a constitutional right to be represented by private counsel who are willing to represent them without cost; *and simultaneously* (2) a constitutional right to receive state-funded ancillary services, such as investigators and experts?  Defendant asserts that the trial court denied his Sixth Amendment right to the counsel of his choice when it decided that an attorney who offered to represent him without pay would not be entitled to receive state funds to obtain ancillary services.  The court, instead, appointed the public defenders.

¶ 2    This question is hard enough to answer because it requires plotting the intersection of cases that discuss the right to counsel of choice with cases that discuss an indigent defendant's right to obtain state-funded ancillary services.  But the question becomes harder to answer because we must also consider whether a Colorado Supreme Court case that describes what happens at that intersection is contrary to cases that the United States Supreme Court has decided.  And finding an answer becomes harder still because we must also evaluate what effect a Chief Justice Directive had on the intersection.

¶ 3    It is a testament to the complexity of this question that the three judges who sat on this case found three different ways to answer it. Two of us answer the question differently, but we both believe that the answer leads us to affirm defendant's conviction. The remaining judge provides a third answer, and she would reverse the conviction.

¶ 4    A grand jury indicted defendant, Aaron Duane Thompson, for numerous charges related to the disappearance and presumed death of his six-year-old daughter, A.T. The prosecution also charged defendant with multiple instances of having physically abused every other child who lived in his home.

¶ 5    At the end of his trial, the jury convicted him of most of the charges. He appeals. We affirm.

## I.    Background

¶ 6    Defendant lived with: his girlfriend, Shely Lowe; her five children, K.S., T.L., A.L., E.W.J., and K.W.; his two children, A.T.J. and A.T.; and her half-brother, R.R. In November 2005, defendant called the police to report that A.T. had run away from home after an argument over a cookie. The police initiated an extensive search for A.T. that proved to be fruitless.

¶ 7    During the investigation, officers spoke with Eric Williams, Sr., Ms. Lowe's ex-boyfriend and the father of two of her children. He told the police that, about a year before defendant had reported A.T. missing, Ms. Lowe told him that A.T. had suddenly died one evening in the bathtub. Ms. Lowe told Mr. Williams that she and defendant had buried the child "far away."

¶ 8    The police also spoke with Ms. Lowe's close friend, Tabitha Graves. Ms. Graves described a conversation with Ms. Lowe approximately one year before defendant reported A.T. missing in which Ms. Lowe said that she had found A.T. dead in the child's bed one morning. Ms. Lowe explained that defendant had removed the child's body from their home and that they were trying to concoct a plan to cover up A.T.'s death.

¶ 9    Officers then questioned the other children in the household. They initially told similar stories that went as follows: They had seen A.T. at home earlier on the day that she ran away. They parroted various details about A.T., including her favorite food, her favorite color, and her most recent Halloween costume.

3

¶ 10    But the officers' questioning turned up more than mundane details.  For example, the children said that defendant and Ms. Lowe disciplined them with "whoopins."

¶ 11    The officers contacted social services, and case workers placed the children with foster families.  Once they were in different environments, the children gradually began to disclose details about physical abuse that they had endured.  They explained that A.T. had not been in the home for some time before defendant reported her missing — evidence at trial indicated that the girl may have been gone for as long as two years — and that defendant and Ms. Lowe had told them to lie to the police about A.T.

¶ 12    A grand jury indicted defendant on sixty charges, including child abuse resulting in death, false reporting, abuse of a corpse, assault, contributing to the delinquency of a minor, child abuse, conspiracy, and accessory.  (The grand jury did not indict Ms. Lowe because she had died of natural causes during the investigation.)

¶ 13    The trial jury convicted defendant of most of the charges, including child abuse resulting in death, child abuse, assault, false reporting, concealing the child's death, contributing to the delinquency of a minor, and conspiracy.

¶ 14    The trial court sentenced defendant to a twelve-year jail

sentence, to be followed by 102 years in prison.

## II.    The Trial Court Did Not Violate Defendant's Sixth Amendment Right to Counsel of Choice

### A.    Background

¶ 15    Shortly after the grand jury indicted him, defendant appeared

before the trial court with an attorney, David Lane.  Mr. Lane said

that he had represented defendant for "about two years" as

"retained counsel."  But defendant was indigent, and Mr. Lane

thought that he would "qualify for court-appointed counsel."  Mr.

Lane made clear that he was "willing to continue" to represent

defendant as "retained counsel."  Although defendant wanted Mr.

Lane "to represent him," he could not pay for ancillary services,

such as "an investigator" or "various experts in various fields."  Mr.

Lane added that the Constitution obligated the trial court to provide

such ancillary services to indigent defendants at state expense.

¶ 16    Mr. Lane asserted that defendant was being forced to choose

between two constitutional rights: the right to counsel of choice and

the right to receive ancillary services at state expense.  He said that

a Colorado Supreme Court case, *People v. Cardenas*, 62 P.3d 621

(Colo. 2002), had forced defendant into making this choice, and that this Colorado case clashed with a more recent United States Supreme Court case, *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006). Mr. Lane then said that the court should allow him to continue to represent defendant and that it should also agree to pay state funds for any ancillary services that defendant might require.

¶ 17 The trial court declined Mr. Lane's invitation to "overrule" *Cardenas*. Mr. Lane then said that defendant could not get a fair trial without ancillary services. So, he was therefore forced to "step aside" and to ask the court to appoint the public defenders to represent defendant. He registered defendant's objection to his being forced to leave the case, citing the Sixth Amendment, the Fourteenth Amendment, and "analogous provisions of the Colorado Constitution."

¶ 18 The trial court promptly appointed the public defenders as defendant's attorneys, and Mr. Lane's connection with this case ended.

## B. Defendant's Contentions

¶ 19 Defendant contends that the trial court denied him his Sixth Amendment right to his counsel of choice. It did so when it decided

that it would not end-run *Cardenas* and authorize Mr. Lane, acting as defendant's retained counsel, to receive state-funded ancillary services in the course of representing defendant.

¶ 20    As far as this issue is concerned, we find ourselves at an unusual divide for a three-judge panel.  Judge Webb "take[s] no position" on the analysis that the reader is about to encounter, but he concurs with the decision to affirm defendant's convictions. Judge Dunn dissents from this part of the opinion.

¶ 21    After examining the constitutional issues that were preserved in the trial court and have been addressed by defendant and the prosecution on appeal, I conclude that (1) the court did not abridge defendant's constitutional right to counsel of choice; and (2) any error that the court may have committed was harmless when, in the absence of a request from Mr. Lane, it did not sua sponte apply a Chief Justice Directive that addressed when a court could provide state-funded ancillary services to indigent defendants who were represented by pro bono counsel.

C.    Right to Counsel of Choice

¶ 22    Defendant's appellate contentions proceed in three steps. Although he cites a variety of authority in support of all three steps,

one or two United States Supreme Court cases form the foundation for each one.

¶ 23    The first step asserts that defendant had "a right to continued representation" by Mr. Lane.  This step relies on cases such as *Gonzalez-Lopez*, 548 U.S. at 140, and *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989).

¶ 24    The second step submits that the trial court violated this right when it declined to rule on Mr. Lane's "request for ancillary services."  This step focuses on *Ake v. Oklahoma*, 470 U.S. 68 (1985).

¶ 25    The third step claims that, by requiring defendant to be represented by the public defender in order to obtain those ancillary services, the trial court improperly placed defendant on the horns of a constitutional dilemma: It forced him to choose between his right to be represented by Mr. Lane, his counsel of choice, and his right to present his defense, via the ancillary services that Mr. Lane sought.  This step is based on *Simmons v. United States*, 390 U.S. 377 (1968).

¶ 26    As I will explain below, these United States Supreme Court decisions do not support defendant's three-step analysis.  I instead

think that the Supreme Court has limited the constitutional right to counsel of choice and the constitutional right to obtain ancillary services at state expense in a way that knits those rights together: Indigent defendants do not have a constitutional right to use state funds to pay for attorneys or for ancillary services of *their* choosing.

¶ 27 *Cardenas* faithfully implemented this shared limitation by requiring that defendants who require state-funded ancillary services be represented by public defenders. Applying *Cardenas*, I conclude that defendant only had a right to state-funded ancillary services if the public defender or court-appointed alternate defense counsel represented him. I further conclude that the trial court did not wrongfully deny defendant's constitutional right to counsel of choice when it declined Mr. Lane's invitation to depart from *Cardenas*.

¶ 28 To be sure, Chief Justice Directive 04-04, Appointment of State-Funded Counsel in Criminal Cases and for Contempt of Court, § V(D) (amended Nov. 2014)(formerly § IV(D)), would have allowed the trial court to pay for support services for a defendant who is represented by private counsel. The trial court did not consider the Directive when it decided to appoint the public

defenders. And Mr. Lane did not ask the court to do so. Be that as it may, I conclude that any error that the court may have made when it did not consider the Directive was harmless.

¶ 29    I begin my analysis by explaining *Cardenas*.

1.    *Cardenas*

¶ 30    A pro bono attorney represented the indigent defendant in *Cardenas*. 62 P.3d at 622. The attorney asked the trial court to appoint, at state expense, an interpreter to help her talk with the defendant, who did not speak English, in order to investigate the circumstances surrounding his guilty plea. *Id.* The court declined.

¶ 31    Our supreme court upheld the trial court's decision. The court first observed that, although "an indigent defendant has the right to legal representation and supporting services at state expense, he does not have the right to pick the attorney of his choice." *Id.* at 623.

¶ 32    The court next concluded that, if the defendant had wanted "the state to pay the costs of his attorney and supporting services, his only choice is to be represented by the public defender, or in the case of a conflict, a state-appointed alternate defense counsel." *Id.* The court supported this conclusion by analyzing several statutes

governing the office of the state public defender.  *See id.* at 622-23. Its analysis yielded the conclusion that the legislature had established such a requirement.  *See id.*

¶ 33    Last, the court observed that, although the defendant had the "right to be represented by" the pro bono attorney, "the state [was] not obliged to pay the costs of that representation."  *Id.* at 623.

¶ 34    I now turn to explaining why I think that the United States Supreme Court cases upon which defendant relies have expressed a shared limitation on the right to counsel of choice and on the right to ancillary services that supports — rather than undercuts — *Cardenas.*  The first stop on that road is to discuss the right to counsel of choice.

### 2.    *Gonzalez-Lopez* and *Caplin & Drysdale*

¶ 35    The right to counsel of one's choice is "circumscribed in several important respects."  *Wheat v. United States*, 486 U.S. 153, 159 (1988).  The "important respect[]" that circumscribes the right in this case is that "a defendant may not insist on representation by an attorney he cannot afford . . . ."  *Id.*  In other words, "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them."  *Gonzalez-Lopez*, 548 U.S. at

11

151; *accord People v. Coria,* 937 P.2d 386, 389 (Colo. 1997)(An indigent defendant has a constitutional right to counsel in a criminal case, "but not an absolute right to demand a particular attorney.").

¶ 36     But, once a court violates a defendant's right to counsel of choice, that error is not subject to harmless error analysis. *Gonzalez-Lopez,* 548 U.S. at 148-50, 152; *accord Anaya v. People,* 764 P.2d 779, 782-83 (Colo. 1988).

¶ 37     Turning to this case, it is true that the United States Supreme Court has, at least twice, said that "the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." *Gonzalez-Lopez,* 548 U.S. at 144 (quoting *Caplin & Drysdale,* 491 U.S. at 624-25).

¶ 38     But this truth is limited in a very important way.  Neither *Gonzalez-Lopez* nor *Caplin & Drysdale* cited *Ake,* a case that I examine in more detail below.  And neither case discussed whether an indigent defendant who had an attorney willing to represent him

at no cost also had the right to require the state to pay for ancillary services.

¶ 39    *Caplin & Drysdale* gives us a tantalizingly strong hint of how the Supreme Court would decide that issue: "Whatever the full extent of the Sixth Amendment's protection of one's right to retain counsel of his choosing, that protection does not go beyond 'the individual's right to spend *his own money* to obtain the advice and assistance of . . . counsel.'"  491 U.S. at 626 (emphasis added)(quoting *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 370 (1985)(Stevens, J., dissenting)).  Indeed, "[a] defendant has no Sixth Amendment right to spend *another person's money* for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice."  *Id.* (emphasis added).

¶ 40    I read this language from *Caplin & Drysdale* to mean that, although defendants' Sixth Amendment right to counsel of choice includes attorneys who are willing to represent them even though the defendants lack funds, *Gonzalez-Lopez*, 548 U.S. at 145, the right does not extend to indigent defendants who require courts to spend public funds to pay for their ancillary services.

¶ 41    The next stop in my reasoning is to discuss the right to ancillary services, which supports my reading of the language from *Caplin & Drysdale.*

### 3.    *Ake*

¶ 42    *Ake* held that, if an indigent defendant "demonstrates . . . that his sanity at the time of the offense is to be a significant factor at trial," then the state must, "at a minimum, assure the defendant access to a competent psychiatrist," who could "conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 83. The Supreme Court qualified this holding in two important ways.

¶ 43    First, it made clear that an indigent defendant did not have a constitutional right "to *receive [state] funds* to hire his own" psychiatrist. *Id.* (emphasis added). This qualification supports my reading of *Caplin & Drysdale,* and it therefore cuts defendant's contention to the bone.

¶ 44    Second, it ceded "the decision on how to implement this right" to the states. *Id.* And *Cardenas* is Colorado's implementation of the right.

¶ 45    Relying partly on *Ake*, our supreme court observed that the "Fourteenth Amendment . . . imposes upon the state the obligation to provide an indigent defendant with those basic instruments and services essential to his or her right to adequately defend against a criminal charge." *People v. Nord*, 790 P.2d 311, 315 (Colo. 1990).

¶ 46    I must now take a detour to explain why *Simmons*, the foundation for the third step in defendant's contention, does not bear the weight that he puts on it.

4.    *Simmons*

¶ 47    Defendant relies on *Simmons* for the proposition that it is "intolerable that one constitutional right should have to be surrendered in order to assert another." 390 U.S. at 394. But *Simmons*, too, has been qualified.

¶ 48    First, the *Simmons* Court limited the scope of its decision by immediately preceding the language quoted above with the statement "[i]n these circumstances." *Id.* The circumstances were as follows: The defendant in *Simmons* had to testify in support of his Fourth Amendment motion to suppress evidence to establish that he had standing, but the prosecution could then use this testimony against him in any subsequent trial. *See id.* at 391-93.

15

Of course, this situation created a Sophie's Choice: If the defendant did not want the prosecution to use his motions hearing testimony at trial, he would have to give up his Fourth Amendment right to challenge the search; if he wanted to establish that he had standing for purposes of his Fourth Amendment motion, he had to give up his Fifth Amendment right for the purposes of his trial. *Id.* at 391, 393-94.

¶ 49     Second, the Supreme Court has not extended *Simmons* very far in criminal cases. *See United States v. Kahan,* 415 U.S. 239, 242-43 (1974)(Supreme Court reserved ruling on whether it should extend *Simmons* to Sixth Amendment claims for appointed counsel); *United States v. Gravatt,* 868 F.2d 585, 590 n.9 (3d Cir. 1989)(same); *see also United States v. Snipes,* 611 F.3d 855, 866 (11th Cir. 2010)("*Simmons* has never been extended beyond its context."); *United States v. Taylor,* 975 F.2d 402, 404 (7th Cir. 1992)("Efforts to extend the scope of *Simmons* have not fared well."); *In re Fed. Grand Jury Procedures (FGJ 91-9), Cohen,* 975 F.2d 1488, 1493 (11th Cir. 1992)("Given the narrow reading the Supreme Court has given" *Simmons,* "we decline to read *Simmons*" more broadly.).

¶ 50    (Our supreme court has only relied on this part of *Simmons* —
a separate part discusses photographic identification procedures —
in cases involving the testimony of a defendant or of a defendant's
expert.  *See, e.g.*, *Perez v. People*, 745 P.2d 650, 653 (Colo. 1987);
*People v. Chavez*, 621 P.2d 1362, 1365 (Colo. 1981).)

¶ 51    Third, I submit that it is, at the very least, unclear whether
*Simmons* is still viable in this regard, and, if so, how far its reach
extends.  Just three years after deciding *Simmons*, the Supreme
Court explained in *McGautha v. California*, 402 U.S. 183, 212-13
(1971), *vacated in part on other grounds sub nom. Crampton v. Ohio*,
408 U.S. 941 (1972), that, "to the extent that [*Simmons'*] rationale
was based on a 'tension' between constitutional rights and the
policies behind them, the validity of that reasoning must now be
regarded as open to question . . . ."  This rationale was "open to
question" because "[t]he criminal process . . . is replete with
situations requiring 'the making of difficult judgments' as to which
course to follow."  *Id.* at 213 (quoting *McMann v. Richardson,* 397
U.S. 759, 769 (1970)).

¶ 52    Simply put, even if a defendant has a constitutional right "to
follow whichever course he chooses, the Constitution does not by

17

that token always forbid requiring him to choose." *Id.* "The threshold question is," instead, "whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved." *Id.*; *see also Corbitt v. New Jersey*, 439 U.S. 212, 219 n.8 (1978)(citing *McGautha* with approval); *Chaffin v. Stynchcombe*, 412 U.S. 17, 30 (1973)(The Constitution does not forbid "every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights.").

¶ 53    Given all of this, "[a]lthough *Simmons* has not been overruled, the Supreme Court . . . questioned its logic" in *McGautha*. *United States v. Rosalez*, 711 F.3d 1194, 1214 n.6 (10th Cir. 2013). And more recent cases have recognized that defendants in criminal cases will sometimes have to make hard choices concerning constitutional rights.

¶ 54    But must I conclude that the premise underlying *Simmons* is unsound to conclude that *Simmons* does not apply this case? No, because the premise itself does not apply. It rested on the tension between the defendant's Fourth and Fifth Amendment rights based on potentially incriminating uses of his suppression hearing

testimony at trial. *See Simmons*, 390 U.S. at 393-94. By its own terms, *Simmons* limited its reach to "these circumstances." *Id.* at 394. This case pivots on the Sixth Amendment instead of on the Fourth and Fifth Amendments, and it does not involve a potentially prejudicial use of a defendant's testimony.

¶ 55    Neither the United States Supreme Court nor our supreme court has subsequently stretched *Simmons* beyond those testimonial circumstances to situations such as those we face in this case. I would decline defendant's invitation to do so. *See Snipes*, 611 F.3d at 866.

¶ 56    But, even if I were to think that *Simmons* applied to this case, I do not believe that defendant faced an "intolerable" choice of surrendering one constitutional right to assert another. *See Simmons*, 390 U.S. at 394. According to *Ake*, defendant did not have "a constitutional right . . . to receive funds to hire his own" experts. 470 U.S. at 83. So defendant was never faced with a choice between two constitutional rights. And, as *McGautha* made clear, "[t]he criminal process . . . is replete with situations requiring 'the making of difficult judgments' as to which course to follow," so *Simmons*' "rationale [that] was based on a 'tension' between

19

constitutional rights and the policies behind them . . . must now be regarded as open to question . . . ." *McGautha*, 402 U.S. at 212-13.

¶ 57    Yes, defendant may have faced a choice between representation by Mr. Lane without any state-funded ancillary services and representation by the public defenders' office with such services. But I do not think that choice was intolerable or unfair. *See id.*; *see also Chaffin*, 412 U.S. at 30. And the choice did not impair the policies behind defendant's right to counsel of choice and his right to obtain ancillary services, *see McGautha*, 402 U.S. at 212-13, because (1) he did not have a Sixth Amendment right to spend another person's — or the state's — money to obtain ancillary services, *see Caplin & Drysdale*, 491 U.S. at 626; and (2) he did not have "a constitutional right . . . to receive funds to hire his own [experts]," *Ake*, 470 U.S. at 83.

¶ 58    As I recognized above, the United States Supreme Court cases upon which defendant relies have not discussed the right to counsel of choice and the right to ancillary services together. But some other courts have done so. Let us take a look at them.

### 5.     Cases From Other Jurisdictions

### a.     Cases That Support My Analysis

¶ 59     Much like our supreme court in *Cardenas,* the Maryland Court of Appeals, that state's highest court, held that the public defenders' services, including access to ancillary services, were not severable.  Indigent defendants were required to accept them as a "package" or forgo them completely.  *Moore v. State*, 889 A.2d 325, 345-46 (Md. 2005).  This arrangement did not violate the defendants' constitutional rights to counsel or to obtain ancillary services.  *Id.* at 346.

¶ 60     In an earlier case, applying similar reasoning, the Maryland Court of Appeals concluded that an indigent defendant who was represented by a pro bono attorney was not entitled to a transcript at state expense because the public defender had not represented him.  *State v. Miller*, 651 A.2d 845, 853 (Md. 1994).

¶ 61     In *Miller v. Smith,* 115 F.3d 1136, 1143-44 (4th Cir. 1997), the Fourth Circuit Court of Appeals held that Maryland's requirement that a defendant accept the public defender's representation in order to gain access to state-funded ancillary services had not

violated the defendant's Sixth Amendment right to counsel of choice.

¶ 62     In *State v. Earl,* 345 P.3d 1153, 1155 (Utah 2015), an indigent defendant, who was represented by private counsel, filed a motion that asked the state to pay for ancillary services. The trial court refused, relying on Utah's statutes governing publicly funded counsel for indigents. *Id.* Those statutes, much like Colorado's, "generally condition[ed] an indigent defendant's eligibility for [ancillary services] on the retention of publicly funded counsel." *Id.*

¶ 63     On appeal, the defendant cited *Ake* and contended that her ability to obtain state-funded ancillary services should not be conditioned on a "public[ly] appointed lawyer." *Id.* at 1158. The Utah Supreme Court disagreed.

> The constitutional right to counsel encompasses the prerogative of choosing counsel of one's choice and of receiving resources necessary to an adequate defense. Such rights are qualified ones, however, affected by the "avenues which [the defendant] chose not to follow as well as those [she] now seeks to widen." When a defendant elects an avenue that steers away from the public representation provided by the government, she has received the private counsel of her choice and has *no constitutional right* to

> defense resources from a secondary source backed by government funding.

*Id.* (emphasis added)(citations omitted).  The court later added that "[a] defendant who opts out of public representation has also opted out of public defense resources, and nothing in the Constitution requires a different result."  *Id.* at 1159.

¶ 64    I am persuaded by these cases because they incorporate the two qualifications that *Ake* placed on the right to obtain a state-funded psychiatrist.  The courts in the Maryland and Utah cases specifically recognized these qualifications, and they relied on them in their opinions.

- In *Moore*, the Maryland Court of Appeals observed that, "while a State might provide funds enabling indigent defendants with retained counsel to hire experts of their own choosing, *Ake does not require this approach.*" *Moore*, 889 A.2d at 343 (emphasis added).

- The Utah Supreme Court noted that "[t]he United States Supreme Court . . . has not prescribed a single orthodoxy for the provision of the defense resources required by the Sixth Amendment."  *Earl*, 345 P.3d at 1158.  Utah's

legislature, like Colorado's, "has chosen to couple the availability of defense resources with the retention of government-funded counsel." *Id.* As a result, an indigent defendant in Utah, like an indigent defendant in Colorado, "has every right to decline the counsel the government offers in favor of the one she prefers, but in so doing, she loses the right to a publicly funded defense." *Id.*

b. Cases That Support Defendant's Analysis

¶ 65 *State v. Brown*, 134 P.3d 753, 759 (N.M. 2006), held that (1) "an indigent defendant represented by *pro bono* counsel[] is entitled both to the constitutional right to counsel and the constitutional right to be provided with the basic tools of an adequate defense"; and so (2) "indigent defendants represented by *pro bono*, contract, or [state public defender] counsel should have equal access to expert witness funding, *provided that* the expert witness meets all of the standards promulgated by" the state public defender.

¶ 66 The defendant in *State v. Wang*, 92 A.3d 220, 226 (Conn. 2014), represented himself. The Connecticut Supreme Court

24

concluded that "due process . . . requires the state to provide an indigent self-represented criminal defendant with expert or investigative assistance when he makes a threshold showing that such assistance is reasonably necessary for" his defense. *Id.*

¶ 67 I am not persuaded by these two cases for a couple of reasons.

¶ 68 First, *Brown* did not discuss the two qualifications that *Ake* placed on the exercise of the right to state-funded psychiatric assistance. *Wang* called them "dicta." 92 A.3d at 232 n.19. That may or may not be accurate.

¶ 69 The first sentence in the paragraph where the two qualifications appear — and that created the right to ancillary services — begins with the phrase, "[w]e therefore hold . . . ." *Ake,* 470 U.S. at 83. The qualifications appear in the sentence *immediately after* the first one, and it begins with the phrase, "[t]his is not to say . . . ." *Id.* This cheek-by-jowl juxtaposition of a right and the limitations on that right looks like a holding to me. And I think that we ignore the Supreme Court's *entire* holding — including the limitations on that holding — at our peril.

¶ 70 Second, both *Brown* and *Wang* relied on *Simmons. See Wang,* 92 A.3d at 231; *Brown,* 134 P.3d at 756. *Wang* placed a judicial

gloss on *Ake* by interpreting it to "*reasonably limit* the right to expert assistance, . . . not to permit a state to impose a choice between two constitutional rights that are not mutually exclusive." 92 A.3d at 232 n.19. As I have explained above, I do not think that *Simmons* supports such a conclusion for a variety of reasons.

¶ 71     I next synthesize the conclusions that I have reached.

> 6.     *Gonzalez-Lopez* & *Caplin & Drysdale* + *Ake* - *Simmons*
>                 = *Cardenas*

¶ 72     My chain of reasoning in reaching the conclusion that the trial court did not violate defendant's right to counsel of choice goes like this:

- Defendant was indigent, so, although he had the right to counsel, he did not have the right to choose his counsel, and he did not have the right to require the state to pay for ancillary services. *See Gonzalez-Lopez*, 548 U.S. at 150-51; *Coria*, 937 P.2d at 389.

- Because he was indigent, he did not have a constitutional right "to receive [state] funds to hire his own" investigator and experts. *Ake*, 470 U.S. at 83.

26

- Our supreme court implemented the right to ancillary services in *Cardenas*. *See Ake*, 470 U.S. at 83.

- By following *Cardenas* and by appointing the public defender to represent defendant, the trial court implemented his right to counsel and his right to ancillary services.

- *Simmons* does not apply in these circumstances, but, even if it did, it would not lead me to the conclusion that the trial court created an intolerable tension between defendant's right to counsel and his right to ancillary services. I conclude instead that the choice that defendant faced — between Mr. Lane and the public defenders — was one of those difficult, but constitutional, choices that defendants sometimes face in the criminal justice system. *See Chaffin*, 412 U.S. at 30; *McGautha*, 402 U.S. at 213.

- The court therefore did not wrongfully deny defendant his right to counsel of choice when it declined Mr. Lane's request to continue to represent him, conditioned on the state's payment for an investigator and various experts.

27

- And, because defendant's right to counsel of choice was not wrongfully denied, we are not automatically required to reverse his conviction. *Contra Gonzalez-Lopez*, 548 U.S. at 148, 152; *Anaya*, 764 P.2d at 782-83.

¶ 73   But, as defendant points out, the trial court did not follow the Chief Justice Directive. What should we do about that?

### D.   The Chief Justice Directive

¶ 74   "Chief Justice Directives represent an expression of Judicial Department policy, to be given full force and effect in matters of court administration." *People v. Orozco*, 210 P.3d 472, 475 (Colo. App. 2009). If the trial court had applied the Directive, it *could* have authorized state funds to pay for ancillary services for defendant while Mr. Lane continued to represent him. (I do not address the issue, discussed in Judge Webb's special concurrence, of whether the Directive violates the separation of powers doctrine. The parties did not raise it in the trial court or on appeal. *See Moody v. People*, 159 P.3d 611, 614-17 (Colo. 2007).)

¶ 75   Based on my preceding analysis, however, I do not think that the trial court erred by implementing *Cardenas* and appointing the public defender to represent defendant. But, even if the court had

erred when it did not consider CJD 04-04 section V(D), that same analysis shows that this error was not of constitutional dimension.

¶ 76 Everyone before us agrees that Mr. Lane did not even mention the Directive to the trial court. *See Hagos v. People*, 2012 CO 63, ¶ 14 (appellate courts review unpreserved nonconstitutional errors for plain error). Still, as Judge Dunn observes, an attorney probably should not have to direct a court's attention to a Chief Justice Directive. But, in the end, we will reverse a conviction because of an unpreserved nonconstitutional error only if the error affected the defendant's substantial rights. Crim. P. 52(b). To have this effect, the error must have "substantially influenced the verdict or affected the fairness of the trial proceedings," *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986), in a manner that casts "serious doubt" over the "reliability of the judgment of conviction," *Scott v. People*, 2017 CO 16, ¶ 15.

¶ 77 Public defenders represented defendant throughout the proceedings. Mr. Lane obviously thought that defendant was in good hands because he told the trial court that, "in [his] estimation, the Colorado Public Defenders are in fact the best criminal defense lawyers in the United States of America." The public defenders had

access to the services of one or more investigators.  They retained experts to testify on defendant's behalf.  I therefore conclude that the trial court's putative nonconstitutional error was harmless because it did not substantially influence the verdict or affect the fairness of defendant's trial.

¶ 78     In summary, defendant's constitutional right to counsel and his constitutional right to ancillary services were scrupulously honored.  The Constitution promised him no more than that.

### III.   Defendant's Convictions for False Reporting and Conspiracy to Commit False Reporting Were Not Barred by the Statute of Limitations

¶ 79     After the prosecution rested, defendant moved for a judgment of acquittal on the false reporting and conspiracy to commit false reporting counts.  He asserted that they were barred by the applicable statute of limitations.  After the trial court denied his motion, the jury convicted him of both counts.  He now contends that the trial court erred.  We disagree.

### A.     Statute of Limitations

¶ 80     We review de novo a trial court's decision to deny a motion for a judgment of acquittal.  *People v. Patton,* 2016 COA 187, ¶ 7.  In doing so, we give the prosecution the benefit of every reasonable

inference that might fairly be drawn from the evidence, both direct and circumstantial. *People v. Valdez*, 2014 COA 125, ¶ 7. We also review de novo statute of limitations claims. *People v. Johnson*, 2013 COA 122, ¶ 7.

## B. Legal Principles

¶ 81    A person commits false reporting when he knowingly makes a report to law enforcement officials "pretending to furnish information relating to an offense or other incident within [law enforcement's] official concern when he . . . knows that [the] information . . . is false." § 18-8-111(1)(c), C.R.S. 2016. And a person is guilty of conspiracy if, with the intent to facilitate or promote its commission, he agrees with another person to engage in criminal conduct or aid that person in the planning or commission of the crime. § 18-2-201(1), C.R.S. 2016.

¶ 82    The statute of limitations for the prosecution of these crimes was eighteen months, section 16-5-401(1)(a), C.R.S. 2016, and it generally began to run when the crime was completed, or, in other words, when all the substantive elements of the crime had been satisfied. *People v. Thoro Prods. Co., Inc.*, 70 P.3d 1188, 1192 (Colo. 2003); *see also Blecha v. People*, 962 P.2d 931, 938 (Colo.

1998)(explaining that a conspiracy terminates when the objective of the conspiracy is obtained).

## C. Application

¶ 83 Defendant asserts that the crimes of false reporting and conspiracy to commit false reporting began and ended with defendant's initial report to the police that A.T. was missing. This report occurred a few days beyond the eighteen-month statute of limitations. So defendant asserts that the statute of limitations had run on those crimes.

¶ 84 We disagree because (1) the indictment did not charge defendant with the initial false report; and (2) defendant made misrepresentations to the police within the eighteen-month statute of limitations period.

¶ 85 One of these misrepresentations that fell within the statute of limitations occurred during a conversation that defendant had with a police officer at a shoe store. The officer accompanied defendant to the store so that defendant could identify a pair of shoes that he had bought A.T. to "assist in the search" for her. Defendant pointed out a pair of shoes that he said were the same style as the ones A.T. had been wearing when she ran away. By identifying the shoes "to

32

assist" the officer in the search for A.T., the jury could conclude that defendant had furnished information to the police concerning A.T.'s disappearance that he knew was false. *See People v. Blue*, 253 P.3d 1273, 1278 (Colo. App. 2011)("The crime of false reporting penalizes those who provide untruthful information to public officials . . . .").

¶ 86    The evidence also supports a reasonable conclusion that defendant had conspired with Ms. Lowe to offer the police a false report. While one officer was with defendant at the store, another officer was at defendant's home with Ms. Lowe. Mr. Williams, Ms. Lowe's ex-boyfriend, called her because the police had asked him to do so. (By this time, the officers already knew that Ms. Lowe had admitted to Mr. Williams that A.T. was dead.) The officer watched Ms. Lowe leave the room to take Mr. Williams' call. When she returned, "she was markedly angrier."

¶ 87    Back at the shoe store, defendant received a couple of cell phone calls. During these calls, the officer who was with him noticed that he became "more and more upset." After being in the store for fifteen to twenty minutes, defendant demanded that the officer take him home. Upon returning home, defendant went

directly inside to be with Ms. Lowe, and he asked that the officer leave the house.

¶ 88    Viewing the reasonable inferences drawn from this evidence in the light most favorable to the prosecution, a reasonable juror could find that, after Ms. Lowe spoke with Mr. Williams, she thought that the police had become suspicious of both the story that A.T. had run away and the information that they had provided to help the police search for her.  A reasonable juror could also find that, after receiving Mr. Williams' call, Ms. Lowe immediately called defendant to confer about how they should tailor their false reports.

¶ 89    We conclude that the record contains sufficient evidence to support defendant's convictions for false reporting and conspiracy to commit false reporting based on conduct that had occurred within eighteen months of when the grand jury indicted defendant on those charges.  We therefore further conclude that these two convictions were not barred by the statute of limitations.

## IV.   The Trial Court Did Not Abuse Its Discretion When It Admitted Certain Evidence

¶ 90    Defendant contends that the trial court erroneously admitted the following out-of-court statements: (1) Ms. Lowe's statements

34

that defendant might face the death penalty; (2) Ms. Lowe's statements to her close friend, Ms. Graves; (3) Ms. Lowe's statements to Mr. Williams; and (4) the children's statements to various people.

## A.     Standard of Review

¶ 91     A trial court has considerable discretion when deciding whether evidence is admissible at trial. *People v. McFee*, 2016 COA 97, ¶ 17. We will therefore only reverse a court's decision to admit evidence if it abused its discretion. *Id.* A trial court abuses its discretion only if its decision is manifestly arbitrary, unreasonable, unfair, or is based on a misunderstanding or misapplication of the law. *Id.*

## B.     Ms. Lowe's Statements About the Death Penalty

### 1.     Additional Background

¶ 92     After Ms. Lowe told Ms. Graves that A.T. had died, Ms. Graves recorded conversations that she had with Ms. Lowe. Ms. Lowe told Ms. Graves that she could be subject to "five years for hiding it" and that "this means death for [defendant]." One of Ms. Lowe's children, A.L., also reported that Ms. Lowe had told him not to cooperate with the police because defendant would receive the

death penalty if the police found out what had actually happened to A.T.

¶ 93 The trial court decided that Ms. Lowe's statements to the child A.L. were relevant (1) to prove that she exerted influence over the child; and (2) to help explain the inconsistencies in A.L.'s statements about A.T.'s disappearance. The court ruled that Ms. Lowe's statements to Ms. Graves were relevant to "show the length [that Ms. Lowe] was willing to go" and "what she was telling others in order to get them to do and act as she felt they should to further the conspiracy."

## 2. Legal Principles

¶ 94 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401. Even relevant evidence may be excluded, however, if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. CRE 403.

### 3. Application

¶ 95    Defendant contends that this evidence was far more prejudicial than probative.  But we conclude that the record supports the trial court's ruling.  Ms. Lowe's statements provided evidence to prove defendant's conspiracy with her to conceal A.T.'s death.  These statements explained A.L.'s false reports to the police, which were made because defendant and Ms. Lowe told the boy to make them.

¶ 96    We next conclude, for two reasons, that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice.  "[O]nly prejudice that suggests a decision made on an improper basis . . . requires exclusion of relevant evidence." *People v. Warner*, 251 P.3d 556, 563 (Colo. App. 2010).  An improper basis is "sympathy, hatred, contempt, retribution, or horror." *People v. Dist. Court*, 785 P.2d 141, 147 (Colo. 1990).

¶ 97    First, although discussion of the death penalty might invoke a strong reaction in a juror, the court instructed the jury that the death penalty was not an issue in this case.

37

¶ 98    Second, the court gave the jury a limiting instruction when it admitted the statements about the death penalty that mitigated any prejudice. The instruction stated that

> [p]ortions of [the recorded statements between Ms. Lowe and Ms. Graves and the statement that Ms. Lowe made to A.L.] may [have] reference[d] the death penalty or potential punishment. This evidence [was] offered for the limited purpose of demonstrating the intent of . . . [Ms.] Lowe [and the effect of these statements on A.L.]. These particular statements are not offered as evidence they are true. You shall not consider this for any purpose other than the limited purpose for which these portions were admitted.

¶ 99    We must presume that the jury followed this instruction, and nothing in the record rebuts this presumption. *See People v. Thomeczek*, 284 P.3d 110, 115 (Colo. App. 2011)(finding that the trial court's limiting instruction mitigated any prejudice resulting from the evidence); *see also People v. Marko*, 2015 COA 139, ¶ 195 ("[A]bsent evidence to the contrary, we presume jurors understand and heed jury instructions.")(*cert. granted* Oct. 24, 2016). We therefore conclude that no juror could have reasonably believed that the death penalty was an issue in this case.

## C.    Hearsay Statements

¶ 100    Defendant contends that the trial court erred in admitting
dozens of hearsay statements made by Ms. Lowe and by the
children.  We address these contentions in turn.

### 1.    Legal Principles

¶ 101    Hearsay is an out-of-court statement that is offered as
evidence at trial to prove the truth of the matter asserted.  CRE
801(c).  Hearsay statements are presumptively unreliable and
generally inadmissible unless they fall within an exception.  *McFee*,
¶ 10.

¶ 102    One such exception is if an unavailable declarant made a
statement against interest.  A statement against interest is
admissible if the statement (1) had so great a tendency to expose
the declarant to criminal liability at the time it was made that a
reasonable person in the declarant's position would have made it
only if the person believed it to be true; and (2) is supported by
corroborating circumstances that indicate its trustworthiness.  CRE
804(b)(3); *see People v. Beller*, 2016 COA 184, ¶ 56.  In determining
a statement's trustworthiness, "the court should consider when and
where the statement was made, what prompted the statement, how

the statement was made, and the substance of the statement."

*People v. Jensen*, 55 P.3d 135, 138 (Colo. App. 2001). The court should also consider "the nature and character of the statement, the relationship between the parties to the statement, the declarant's probable motivations for making the statement, and the circumstances under which the statement was made." *Bernal v. People*, 44 P.3d 184, 197 (Colo. 2002).

¶ 103 Out-of-court statements may also be admissible because they are not hearsay. As is relevant to this case, statements in this category include those made by a co-conspirator during the course of and in furtherance of a conspiracy. CRE 801(d)(2)(E); *Blecha*, 962 P.2d at 937. Such statements are admissible against all co-conspirators. *Blecha*, 962 P.2d at 937. To be admissible, the proponent of the statement must show, by a preponderance of the evidence, that a conspiracy existed and that the statements were made during the course of and in furtherance of the conspiracy. *People v. Faussett*, 2016 COA 94M, ¶ 34. Although the contents of the statements may be considered to satisfy this burden, evidence must corroborate the existence of the conspiracy apart from the statements themselves. *Id.*

¶ 104　In addition to the evidentiary rules concerning the admission of hearsay, out-of-court statements must also satisfy the Federal and State Confrontation Clauses.  U.S. Const. amend. VI; Colo. Const. art. II, § 16.  The Confrontation Clauses provide a criminal defendant with the right to confront the witnesses against him; they therefore prohibit the introduction of testimonial statements when the declarant is unavailable to testify at trial and was not previously subject to cross-examination.  *Crawford v. Washington*, 541 U.S. 36, 59 (2004); *see People v. Fry*, 92 P.3d 970, 975-76 (Colo. 2004).

¶ 105　When a hearsay statement is nontestimonial, the Federal Confrontation Clause is not triggered.  *See Michigan v. Bryant*, 562 U.S. 344, 357-59 (2011).  The statement, however, may still be barred under the Colorado Confrontation Clause unless the declarant is unavailable and the statement bears sufficient indicia of reliability.  *People v. Phillips*, 2012 COA 176, ¶ 84.  "A statement is reliable if it falls within a firmly rooted hearsay exception or if there is a showing of particularized guarantees of trustworthiness."  *People v. Villano*, 181 P.3d 1225, 1228 (Colo. App. 2008).

¶ 106    We review the questions of whether a statement is testimonial and whether its admission violated the defendant's confrontation rights de novo. *Phillips,* ¶ 85.

### 2. Ms. Lowe's Out-of-Court Statements to Ms. Graves

#### a. 2004 Conversation

¶ 107    Ms. Graves described a conversation with Ms. Lowe at a park in 2004. Ms. Lowe became emotional, and she explained that one morning A.T. did not come down for breakfast. She said that when she went to check on A.T., she found the girl unresponsive in her bed.

¶ 108    According to Ms. Lowe, when defendant saw A.T.'s condition, he told her to leave the room. Several hours later, he left the house with A.T., and he did not come back for quite some time.

¶ 109    Ms. Lowe told Ms. Graves that she could not go to the police because the police would take her children. She said that she had discussed several stories with defendant to cover up A.T.'s death. In one of these stories, defendant would claim that he had taken A.T. to see her biological mother in Michigan, but someone had kidnapped the girl while they were en route.

¶ 110 Ms. Lowe asked Ms. Graves to come with her to find a place on the route to Michigan that they could claim was the place where the child had been kidnapped. Ms. Graves refused to participate.

¶ 111 At the pretrial admissibility hearing, the court heard this testimony from Ms. Graves. It found that Ms. Lowe was unavailable, that her statements subjected her to criminal liability for concealing the death of A.T., and that she understood the legal consequence of her statements. The court also determined that Ms. Lowe's statements were trustworthy and reliable because of the nature and the character of the circumstances surrounding them. Based on these findings, the court admitted the 2004 conversation as a statement against interest. (The court alternatively admitted the contents of the conversation as res gestae. We do not address that part of the court's ruling because we conclude that the statements were admissible as statements against interest.)

¶ 112 Defendant contends that the trial court erred when it admitted the contents of the 2004 conversation between Ms. Lowe and Ms. Graves because the statements were not reliable. We disagree for the following reasons.

¶ 113    First, the record supports the trial court's findings.  The statements inculpated Ms. Lowe in her conspiracy with defendant to conceal A.T.'s death.

¶ 114    Second, Ms. Graves' testimony about the circumstances surrounding the conversation showed that the statements were reliable.  She stated that she and Ms. Lowe were best friends and that they shared everything.  Ms. Graves also testified that Ms. Lowe's demeanor was unusual, so Ms. Graves knew that something was bothering her.  When Ms. Lowe mentioned A.T.'s death, she began crying and shaking.

¶ 115    Third, the record indicates that Ms. Lowe's statements were voluntary, they were reasonably detailed, they reflected her personal knowledge of the events, and they inculpated her as well as defendant.  As the court noted, Ms. Lowe "was very careful not to just dump [it] on . . . Mr. Thompson."

¶ 116    And, although Ms. Lowe's statement that A.T. had died was not, by itself, a statement against interest, we do not think that the court erred when it admitted it.  Under CRE 804(b)(3), the court may admit not only the precise statement against interest but also "related, collaterally neutral statements." *People v. Newton*, 966

44

P.2d 563, 578 (Colo. 1998)("[S]evering collaterally neutral statements from each precise self-inculpatory remark deprives the jury of important context surrounding that self-inculpatory remark.").

¶ 117    Ms. Lowe's statement that A.T. was dead was one of those related, collaterally neutral statements.  Without that statement, Ms. Lowe's additional comments about concealing A.T.'s death and soliciting Ms. Graves to assist her in doing so would not have made any sense.  The statement that A.T. had died was therefore necessary to understand the 2004 conversation.  Based on the totality of the circumstances, we conclude that the trial court did not abuse its discretion when it admitted the contents of the conversation as statements against Ms. Lowe's penal interests.

¶ 118    As for the Federal Confrontation Clause, defendant concedes that Ms. Lowe's statements were nontestimonial.  Still, he continues by asserting that her nontestimonial statements violated the Colorado Constitution's Confrontation Clause because they did not bear sufficient indicia of reliability.  *See Phillips*, ¶ 84.  But the trial court's finding that Ms. Lowe's statements against interest were supported by corroborating circumstances, in effect, "incorporate[d]

the [Colorado] Confrontation Clause's requirement that a statement bear particularized guarantees of trustworthiness." *Beller*, ¶ 58. Because the record supports the trial court's reliability findings, we conclude that the court's admission of these statements did not violate the Colorado Confrontation Clause.

### b. The Recorded Statements

¶ 119 The second set of statements between Ms. Lowe and Ms. Graves began a year after their 2004 conversation. Ms. Graves, cooperating with the police, recorded multiple conversations she had with Ms. Lowe. During these conversations, Ms. Lowe repeatedly tried to dissuade Ms. Graves from talking to the police about A.T. Ms. Lowe also expressed regret for telling Ms. Graves about A.T.'s death. The court ruled that the recorded statements were nontestimonial, and the court admitted them as co-conspirator statements because they "were clearly statements in furtherance of and during the course of the conspiracy."

¶ 120 Defendant contends that, because the recorded statements were obtained at the direction of the police, they were testimonial and that their admission violated the Federal Confrontation Clause. But statements made by a co-conspirator in furtherance of the

conspiracy are nontestimonial. *See Villano*, 181 P.3d at 1228-29;

*see also United States v. Patterson*, 713 F.3d 1237, 1247 (10th Cir.

2013)("[B]ecause these statements were made in furtherance of a

conspiracy, they are nontestimonial and present no Sixth

Amendment problem."). And the United States Supreme Court has

said that such statements are nontestimonial even if made to a

person working with, or at the direction of, the police. *See Bourjaily*

*v. United States*, 483 U.S. 171, 181-84 (1987); *see also Villano*, 181

P.3d at 1228-29 (holding that a co-conspirator's statements to an

undercover police officer made during the course of and in

furtherance of the conspiracy were nontestimonial).

¶ 121    *Bourjaily* is instructive. The Supreme Court rejected the

defendant's contention that the admission of a conversation

between a co-conspirator and a confidential police informant

violated the Federal Confrontation Clause. *Bourjaily*, 483 U.S. at

183. Although *Bourjaily* did not consider whether the statements

were testimonial, the Supreme Court later referenced *Bourjaily* as

consistent with the principle that the Sixth Amendment permits the

admission of nontestimonial statements in the absence of prior

opportunities for cross-examination. *Crawford*, 541 U.S. at 58; *see*

*also United States v. Hendricks*, 395 F.3d 173, 183-84 (3d Cir. 2005); *People v. Compan*, 100 P.3d 533, 537 (Colo. App. 2004), *aff'd*, 121 P.3d 876 (Colo. 2005). And, contrary to defendant's contention, Ms. Lowe's suspicion that Ms. Graves was cooperating with the police does not alter the application of *Bourjaily*. Indeed, it would be hard to conclude that a reasonable person in Ms. Lowe's position would have made incriminating statements if she had believed that they would later be used in the investigation or prosecution of a crime. We therefore conclude that Ms. Lowe's recorded statements to Ms. Graves were not testimonial.

¶ 122    The record also supports the trial court's conclusion that the recorded statements were co-conspirator statements. Defendant and Ms. Lowe engaged in a "separate conspiracy to conceal" A.T.'s death after the conspiracy to cause her death. *Blecha*, 962 P.2d at 938. Ms. Lowe's statements to Ms. Graves were therefore made in furtherance of, and during the course of, an active conspiracy.

¶ 123    We conclude that the trial court properly admitted these statements as co-conspirator statements. And, although the recorded statements included information in addition to the specific statements in furtherance of the conspiracy, we further conclude

48

that the trial court did not abuse its discretion when admitting them because the parties had agreed that the court should consider "the statements coming in as a whole, rather than a line-by-line analysis of each conversation."

¶ 124    Last, to the extent that defendant also challenges these nontestimonial statements under the Colorado Confrontation Clause, "[t]he admissibility of co-conspirator statements is so firmly rooted in law that a court need not independently inquire into the reliability of a co-conspirator's statement." *Villano*, 181 P.3d at 1228-29.  The admission of these statements therefore satisfied the Colorado Confrontation Clause's requirements.  *See Beller*, ¶ 53 ("A statement is sufficiently reliable for confrontation purposes if it falls within a firmly rooted hearsay exception . . . .").

### 3.    Ms. Lowe's Statements to Mr. Williams

¶ 125    Mr. Williams described a conversation he had with Ms. Lowe a year before A.T. allegedly ran away.  They were alone in a car when Ms. Lowe pulled over and told Mr. Williams that A.T. had stopped breathing during a bath.  She claimed that, despite her efforts, she could not bring A.T. back to life.  When Mr. Williams asked her why she did not call for help, she responded that she did not want her

49

children to be taken away because A.T. had a scar on her back from a "beating." She then told Mr. Williams that she and defendant had decided to drive A.T.'s body far away to bury it. She said that, when they were burying A.T., "she [could] hear[] the last little breaths of life come out of her body."

¶ 126 Ms. Lowe then explained that she and defendant had a story to explain A.T.'s disappearance: Defendant had taken A.T. to see her biological mother in Michigan and that someone had kidnapped A.T. during the trip.

¶ 127 Ms. Lowe then asked Mr. Williams to commit identity theft to help her raise money for defendant's legal fees. He declined.

¶ 128 We conclude that Ms. Lowe's statements to Mr. Williams about A.T.'s death, her participation in A.T.'s burial, and her attempts to conceal A.T.'s death were admissible statements against interest. Much like the statements that Ms. Lowe had made to Ms. Graves, she told Mr. Williams that A.T. had died without any prompting by him. She then described her efforts to conceal the girl's death. She added that she had heard A.T.'s last breaths while she and defendant were burying the girl. These statements about Ms. Lowe's efforts to conceal A.T.'s death subjected her to criminal

liability. And Ms. Lowe's statement that A.T. was still breathing when they buried her inculpated her in killing A.T.

¶ 129 The circumstances under which Ms. Lowe made the statements also support the trial court's determination that they were reliable. Mr. Williams described his long relationship with Ms. Lowe. He said that they had been best friends who confided in each other. Ms. Lowe voluntarily made these statements to Mr. Williams while they were alone in a car and when she was visibly upset. She did not shift the blame to Mr. Thompson but equally inculpated herself in (1) burying A.T. while she was still alive; and (2) concealing A.T.'s death. We therefore conclude the court did not abuse its discretion when it admitted Ms. Lowe's statements to Mr. Williams.

¶ 130 Ms. Lowe's statement soliciting Mr. Williams to commit identity theft to raise money for defendant's legal funds is not as straightforward. At the pretrial hearing, Mr. Williams testified that Ms. Lowe asked him to commit identity theft during the same conversation in which she disclosed A.T.'s death. At trial, however, he testified that this statement was made "a week [or] week and a half" later. Because the trial court did not consider this statement

51

separately, it did not make individualized reliability findings or consider the circumstances under which this second conversation occurred. Based on the record before us, we cannot determine the trustworthiness of the statement. *See Newton*, 966 P.2d at 575-76 (explaining that trial court should make findings on the trustworthiness of the statement against interest).

¶ 131　Even so, and if we assume that admitting this statement was error, we conclude, for the following reasons, that this putative error was harmless. First, it was not a constitutional error. *See Faussett*, ¶ 54 (listing the facts a court should consider when deciding whether an error is harmless). Second, this statement was not crucial to the prosecution's case. *See id.* Third, this statement was somewhat tangential because it did not directly concern defendant's or Ms. Lowe's responsibility for A.T.'s death. *See id.* Fourth, the prosecutor did not emphasize this evidence in closing argument. Fifth, this was not a close case; the prosecution's evidence was strong. *See id.*

## D.  The Children's Statements

### 1.  The Children's Testimony About "the A.T. Story"

¶ 132   Following defendant's report that A.T. had run away from home, police officers spoke with the other seven children who lived in the home.  Forensic interviewers also spoke with most of the children shortly after they had been removed from that home.

¶ 133   In the beginning, the children's stories were fairly consistent. They all repeated the story that A.T. had run away and that they remembered seeing A.T. at home on the morning that defendant had reported her as a runaway.  The children also repeated similar details about A.T., including describing her Halloween costume that year and naming her favorite food and her favorite color.  The court described these statements as "the A.T. story."

¶ 134   But, as time passed, the children revealed that the A.T. story was a lie that defendant and Ms. Lowe had instructed them to tell.

¶ 135   The trial court admitted the children's renditions of the A.T. story not for the truth of the story — it was not true — but as nonhearsay verbal acts.  A verbal act is admissible to show that the statement was actually made, not to prove the truth of it.  *People v. Scearce*, 87 P.3d 228, 233 (Colo. App. 2003).  And, if an

out-of-court statement is not offered for its truth, it is admissible as nonhearsay evidence as long as it is relevant to the issues presented. *Phillips*, ¶ 62.

¶ 136 To the extent that defendant contends that the trial court erred when it admitted the children's individual versions of the A.T. story, we disagree. The children knew when they told the A.T. story to the police that it was false. They later admitted that defendant and Ms. Lowe had instructed them to tell that false story.

¶ 137 The prosecution had charged defendant with contributing to the delinquency of each child because he had instructed them to make a false report to the police by telling the officers the A.T. story. Those statements were therefore relevant, not for their truth, but to prove that (1) defendant had told the children to lie to the police; and (2) the children had done as they had been told.

¶ 138 Defendant adds that, because A.T.J. did not testify at trial, the court violated the Federal Confrontation Clause when it admitted his version of the A.T. story. *See Crawford*, 541 U.S. at 59. But A.T.J.'s statements were verbal acts, and the court did not admit them for their truth. Instead, as noted above, A.T.J.'s statements provided evidence that, at defendant's instruction, he had lied to

the police. Because A.T.J.'s statements were not hearsay, the Confrontation Clause did not apply to them. *People v. Robinson*, 226 P.3d 1145, 1151 (Colo. App. 2009)("[T]he admission of nonhearsay does not implicate a defendant's confrontation rights."); *see also Crawford*, 541 U.S. at 59 n.9 ("The Clause also does not bar . . . the use of testimonial statements for purposes other than establishing the truth of the matter asserted."); *accord People v. Isom*, 140 P.3d 100, 103 (Colo. App. 2005).

¶ 139 We therefore conclude that the trial court did not abuse its discretion when it admitted the children's various versions of the A.T. story that they had told to police officers and to forensic interviewers.

2. The Children's Statements About Child Abuse

¶ 140 Beginning with their initial police contact, the children described the physical abuse that defendant and Ms. Lowe had inflicted on them. The children continued to disclose more specifics about the abuse as they made additional statements to forensic interviewers, therapists, caseworkers, and foster parents.

¶ 141 After a pretrial evidentiary hearing, the trial court considered the admissibility of the children's statements one by one. The court

admitted the majority of these statements under the child hearsay statute. *See* § 13-25-129(1), C.R.S. 2016. In doing so, it carefully considered the relevant factors for admission, and then it provided detailed and thorough findings about the reliability of the children's statements.

¶ 142 As an initial matter, we reject defendant's contention that the trial court erred when it denied his request to subpoena the children to testify at the pretrial hearing. To be sure, a defendant may subpoena a child victim to testify at a pretrial hearing, but only if "he can show that such testimony would be relevant and necessary." *People v. Snyder*, 849 P.2d 837, 838 (Colo. App. 1992). In many instances, the victim's testimony may be needed for the court's pretrial admissibility determination, but there is no requirement that the court must take such testimony. *See id.*

¶ 143 The trial court considered defendant's offers of proof about why he thought the children should testify at the hearing. But, in light of the evidence that had already been presented, the court decided that the children would not be required to testify.

¶ 144 Specifically, the court pointed to the testimony of the witnesses to whom the children had made the statements, the

audio and video recordings of the statements, and the transcripts of the statements. The court ruled that these sources of information were "what really truly illuminates" whether the children's statements were reliable when they were made. In other words, the children's testimony about statements that they had made several years before would not add anything meaningful to the court's analysis because it had ample evidence from the time when the children had made those statements. We therefore conclude that the record supports the court's determination that the children did not have to testify at the pretrial evidentiary hearing. *E.g.*, *People v. Juvenile Court*, 937 P.2d 758, 761 (Colo. 1997)(stating that a child victim need not testify at the hearing).

¶ 145   We now turn to analyzing the trial court's decision to admit the children's statements at trial. When a child abuse victim testifies at trial, the child's prior out-of-court statements about any act of abuse that the child suffered or that the child witnessed may be admitted if the court finds that the time, content, and circumstances of the statements provide sufficient safeguards of reliability. § 13-25-129(1)(a), (b)(I); *People v. Pineda*, 40 P.3d 60, 67 (Colo. App. 2001). These safeguards of reliability include factors

such as (1) whether the statement was spontaneous; (2) whether it was made while the child was still upset or in pain from the alleged abuse; (3) whether the language was likely to have been used by a child of the victim's age; (4) whether it was heard by more than one person; (5) whether the child victim had a bias against the defendant; (6) whether intervening events could account for the statement; (7) whether the allegation was in response to a leading question; and (8) the general character of the child victim. *People v. Rojas*, 181 P.3d 1216, 1218-19 (Colo. App. 2008); *see also People v. Dist. Court*, 776 P.2d 1083, 1089-90 (Colo. 1989). While these factors provide guidance and direction, the absence of one or more factor does not bar a court from admitting a statement. *See Dist. Court*, 776 P.2d at 1090.

¶ 146    We will uphold a court's decision to admit a child hearsay statement "if the record shows an adequate factual basis to support its decision." *Phillips*, ¶ 91.

¶ 147    First, defendant contends that the children's initial statements to the police were not spontaneous, specific, or close in time to the reported abuse. He also contends that the children were subjected

to interrogation techniques designed to "break" the children. The record, however, refutes these assertions.

¶ 148   After the children relayed the A.T. story to the police officers, the officers asked them individually about the type of punishment they received. The children reported that they received "whoopins." While fairly general, their response was to an open-ended question, they used age-appropriate language, and the court found that the children did not have a motivation to lie about the child abuse.

¶ 149   The court also noted that the manner in which the children brought up the abuse increased the reliability of their statements. In particular, the court observed that the abuse "was such a day-in-day-out reality [for] these children they didn't even consider it to be remarkable [such] that they shouldn't tell law enforcement about [it]." The record also supports these findings.

¶ 150   Second, defendant submits that the children's reports of abuse to their respective therapists, caseworkers, foster parents, and teachers were unreliable because intervening events precipitated the disclosures, the abuse did not occur close in time to the disclosures, the children were aware that disclosing abuse

led to them receiving considerable attention, and the children's prior lies to the police undercut their credibility.

¶ 151 The trial court considered these arguments at the pretrial hearing and found that factors surrounding the children's statements — considered in their individual circumstances — overcame these contentions. *See Rojas*, 181 P.3d at 1220 ("[T]he fact that not all the relevant factors support admissibility does not require exclusion of the statements."). The court found that the children's reports of abuse were made in response to open-ended questions, in age-appropriate language, without a motivation to lie about the abuse, and in environments in which the children felt safe. Given the court's thorough findings about the admissibility of the children's statements, we conclude that the court did not abuse its discretion when it admitted these statements.

¶ 152 Third, we reject defendant's contention that the trial court should not have admitted the children's descriptions of their abuse in 2007 forensic interviews because that time was too remote from the incidents of abuse. Although these interviews occurred almost two years after the children were removed from the home, the record supports the court's finding that no intervening events had

60

occurred that would have prompted the children to make up their descriptions of the abuse that they had suffered. And, for some of the children, the therapeutic sessions they had participated in during these two years appeared to explain why they were able to recall specific incidents of abuse years after it occurred. In sum, the circumstances surrounding these interviews and the content of the children's statements support the trial court's determination that they were reliable. *See, e.g.*, *People v. Brown*, 2014 COA 155M-2, ¶ 29 ("[W]e defer to the trial court's findings of fact which are supported by the record.").

### 3. Statements Admitted Under the Residual Hearsay Exception

¶ 153 Defendant next contends that the trial court erred when it admitted some of the children's out-of-court statements under the residual hearsay exception, including: (1) A.L.'s 2007 forensic interview; (2) R.R.'s statement to his foster parent; and (3) the children's admissions to the 2005 forensic interviewer that their reports of A.T.'s disappearance were not truthful and that defendant and Ms. Lowe had instructed them to lie.

### a.    Legal Principles

¶ 154    In the absence of a particularized exception, a trial court may admit hearsay statements under the residual hearsay exception. CRE 807.  Under this exception, the court must determine that (1) circumstantial guarantees of trustworthiness support the statement; (2) the statement provides evidence of a material fact; (3) the statement is more probative of the material fact than other evidence available; (4) admission serves the interests of justice and purposes of the rules of evidence; and (5) the adverse party had adequate notice of the proponent's intention to introduce the statement.  *People v. Fuller*, 788 P.2d 741, 744 (Colo. 1990).

¶ 155    In evaluating the trustworthiness of a statement for purposes of the residual exception, "we examine the nature and character of the statement, the relationship of the parties, the probable motivation of the declarant in making the statement, and the circumstances under which the statement was made."  *McFee*, ¶ 19. The party offering the statement must establish its trustworthiness by a preponderance of the evidence.  *Brown*, ¶ 20.

### b. A.L.'s Statements to the Forensic Interviewer

¶ 156   In 2007, A.L. made statements to the forensic interviewer recounting specific instances of abuse that defendant and Ms. Lowe had inflicted on him. A.L. also participated in a follow-up interview with the police about these reports. Because A.L. was sixteen years old at the time that he made these statements, the child hearsay statute did not apply. *See* § 13-25-129(1).

¶ 157   But the court decided that these statements were admissible under the residual hearsay exception. In making this determination, the court found that the statements were supported by circumstantial guarantees of trustworthiness because A.L. (1) had no motivation to hurt defendant; (2) had first-hand knowledge of the events; (3) made the statements during a forensic interview; (4) made the statements after participating in therapy; and (5) was comfortable speaking with the forensic interviewer. The court also determined "that these statements [were] more probative on the point in terms of the comfort level and being able to talk about those things and give full descriptions."

¶ 158   For similar reasons, the court found that A.L.'s follow-up interview with the police had "heightened reliability," so it was admissible under CRE 807.

¶ 159   We are not persuaded by defendant's contention that the trial court erred when it found that A.L.'s statements in the forensic interview were not more probative of the abuse that he had suffered than other available evidence.  Even though A.L. was able to testify to the instances of abuse, the trial court found that, because of A.L.'s prior antagonistic demeanor toward law enforcement and, by contrast, the surprising "comfort[]" that he had shown in the forensic interview, he was able to provide a clear description of what happened in the forensic interview.  We defer to these findings because the record supports them.  *See Brown*, ¶ 29.

c.   R.R.'s Statements to Police Officers

¶ 160   We next turn to R.R.'s statements.  Following his interview with the police officers, R.R. was crying and enraged.  He blamed the police for breaking his family apart.  During the ride to his foster home, he spoke in "a string of consciousness," and he admitted that he had not seen A.T. since he had moved in with

defendant and Ms. Lowe almost a year previously, and that Ms. Lowe had instructed him what to tell the police about A.T.

¶ 161 The court admitted these statements under the residual hearsay exception and as excited utterances. Even if we assume that the court should not have admitted the statements under the residual exception, defendant does not challenge their admission as excited utterances on appeal. *See* CRE 803(2); *see also Lawson v. Stow*, 2014 COA 26, ¶ 41 ("[A] party's failure to present a cogent argument contesting a court's alternative basis for judgment requires us to affirm the judgment."); *Phillips*, ¶ 63 ("We may uphold the trial court's evidentiary decision on any ground supported by the record . . . ."). We therefore conclude that the trial court did not err when it admitted these statements as excited utterances.

d. The Children's Statements to the Forensic Interviewer

¶ 162 Defendant next asserts that the trial court erred when it admitted particular statements that the children made in 2005 to a forensic interviewer. These statements included (1) the children's disclosures that defendant and Ms. Lowe had instructed them to lie to the police; and (2) some related statements that the court had admitted for the truth of the matters asserted in them.

¶ 163    As we have observed above, the trial court made thorough and detailed reliability determinations regarding each of these statements, and it decided that the circumstances surrounding the children's disclosures during their forensic interviews were reliable and more probative about the abuse than the other evidence. The court noted that these statements were made immediately after the children had been removed from the home and that they had given "a real snapshot of what was going on" at that point in time.

¶ 164    We conclude that the trial court did not abuse its discretion when it admitted these statements because the record supports the trial court's findings and analysis.

4.    Special Concerns About the Reliability of K.W.'s Statements

¶ 165    Defendant asserts that K.W.'s statements were not reliable because, at the time that she made them, she was developmentally delayed and she had a speech impediment. We disagree.

The trial court admitted four of K.W.'s out-of-court statements:

- K.W.'s initial statement to the police right after defendant had reported that A.T. had run away. She said that A.T. had walked down the street. The court admitted this false report as a verbal act.

- K.W.'s statement to a caseworker that A.T. had not been in the home for some time.

- K.W.'s forensic interview.

- K.W.'s statement to her therapist that disclosed specific instances of child abuse.

¶ 166   The trial court recognized that K.W. was developmentally delayed, but it noted that "just because someone is developmentally delayed[,] [it] does not make them ipso facto unreliable."  It then considered the content and circumstances of K.W.'s out-of-court statements.  It found that, given the "matter of fact" manner in which the statements were made and the appropriate language used, there were sufficient guarantees of reliability.  We conclude that the record supports these findings and that the trial court did not abuse its discretion when it admitted these statements.

## E.    Expert Testimony

¶ 167   Defendant asserts that two expert witnesses improperly vouched for the children's credibility.  We disagree.

¶ 168   We review the trial court's decision to admit expert testimony for an abuse of discretion.  *See, e.g.*, *People v. Watson*, 53 P.3d 707, 711 (Colo. App. 2011).  On the one hand, an expert witness may not

testify, either directly or by implication, that a child victim was telling the truth when the child reported an incident of abuse. *See Venalonzo v. People*, 2017 CO 9, ¶ 32. On the other hand, "experts may testify concerning whether a victim's behavior or demeanor is consistent with the typical behavior or demeanor of victims of abuse." *People v. Glasser*, 293 P.3d 68, 78 (Colo. App. 2011).

¶ 169 One of the experts in this case, a psychotherapist, offered the opinion that the children had come from a "closed family system." This meant that they could have trouble adjusting to the foster homes in which they had been placed. She added that it was not unusual for a victim of child abuse, (1) such as E.W.J. in this case, to blame himself for the abuse that he had received; or, (2) such as K.S. in this case, to shut down for a while, but then to remember more particulars about her abuse over time.

¶ 170 The second expert, a forensic interviewer, talked about "barriers to disclosure," or factors in a child's life that might prevent him or her from disclosing what had happened. These included the prospect that a parent might be imprisoned if the authorities learned what had happened; familial relationships; and familial

cultures, such as when parents taught children not to cooperate with police officers or with other governmental figures.

¶ 171   We conclude, for the following reasons, that the record in this case establishes that these two experts did not vouch for the children's veracity, either directly or indirectly.

¶ 172   First, the experts did not testify, either directly or by implication, that the children were telling the truth.  *See* CRE 608(a); *People v. Eppens*, 979 P.2d 14, 17 (Colo. 1999).

¶ 173   Second, they did not say that they believed the children.  *See People v. Oliver*, 745 P.2d 222, 225 (Colo. 1987).

¶ 174   Third, they did not suggest that children do not tend to make up a story that they have been abused.  *People v. Snook*, 745 P.2d 647, 649 (Colo. 1987).

¶ 175   Fourth, they did not try to explain inconsistencies in the children's testimony.  *See Venalonzo*, ¶ 36.

¶ 176   Rather, the experts' testimony concerned the typical demeanor and traits of abused children.  *See People v. Mintz*, 165 P.3d 829, 831 (Colo. App. 2007).  This testimony was admissible because it helped the jury to understand the children's behavior after they had been abused.  *People v. Relaford*, 2016 COA 99, ¶ 28.  Such

information provided "a relevant insight into the puzzling aspects of the child's conduct and demeanor which the jury could not otherwise bring to its evaluation . . . ." *People v. Whitman*, 205 P.3d 371, 383 (Colo. App. 2007)(citation omitted). In other words, the expert testimony in this case "deal[t] with the . . . general characteristics evidence which (1) relate[d] to an issue apart from credibility and (2) only incidentally tend[ed] to corroborate a witness's testimony." *People v. Cernazanu*, 2015 COA 122, ¶ 20.

F.     Evidence Concerning Financial Circumstances

¶ 177     Defendant asserts that the trial court erred when it admitted certain financial evidence, specifically (1) how much the search for A.T. cost the taxpayers, as reflected by a video showing the police search for her; (2) defendant's and Ms. Lowe's reliance on government assistance, including subsidized housing and welfare; and (3) evidence that defendant and Ms. Lowe had bought a timeshare in Florida. He asserts that this information was only relevant to show that he and Ms. Lowe were "sponges on society" who had nonetheless purchased the luxury of a timeshare. We disagree. We conclude that this evidence was relevant and that its

relevancy was not outweighed by the danger of unfair prejudice. *See* CRE 401, 403.

¶ 178    First, the video documenting the police efforts to search for A.T., which was only six minutes long, was relevant to show that the police had taken defendant's report that A.T. was missing seriously, that they had not prematurely focused their investigation on defendant and Ms. Lowe, and that their entire investigation was not shoddy.  (Ms. Lowe had told Ms. Graves that the police had not done "anything" and that they did not believe defendant and Ms. Lowe.)  This probative value was not substantially outweighed by the danger that it would unfairly prejudice the jury to regard defendant with "sympathy, hatred, contempt, retribution, or horror."  *See Dist. Court,* 785 P.2d at 147.

¶ 179    Second, the information about defendant's and Ms. Lowe's welfare payments was relevant to show that they had claimed benefits for A.T., and that they had continued to do so after she died in order to keep her death secret.  And the public housing information was mentioned only fleetingly to explain why a witness had inspected defendant and Ms. Lowe's home.  Again, this information was not unduly prejudicial.  *See id.*

¶ 180    The timeshare application was admitted because defendant had claimed that the entire family, including A.T., had gone to Florida on vacation about five months before defendant had reported to the police that she had run away.  (Evidence established that A.T. had died about eighteen months before this Florida trip.)  Defendant said that he did not have any photographs from this trip, but Ms. Lowe provided photographs that did not include A.T.  So the application was relevant to show that the police had a reason to expand their investigation to the area in Florida where the timeshare unit was located to see if anyone had seen A.T. during this period.  There was nothing unduly prejudicial about this information, either.  *See id.*

¶ 181    Last, the prosecution did not contend that defendant and Ms. Lowe were "sponges on society"; there was no suggestion that the jury should convict defendant because he was a moocher or a welfare cheat.

## G.    Cumulative Evidence

¶ 182    Defendant submits that the cumulative effect of all this allegedly improper evidence risked confusing the jurors or tiring them out.  But defendant offers little in support of this submission.

He points to statements by several jurors that they doubted their ability to sort through fifty-five counts, to an allegation that one juror had been asleep at one point during the trial, and to the fact that the jury sent the court eleven questions while it was deliberating.

¶ 183    But none of these factors, separately or together, established that the jury was exhausted or confused.  The court excused the jurors who thought that they could not work their way through all the counts.  The allegedly sleeping juror told the court that he had not been sleeping and that he had been alert and listening to the testimony.  And the jury's questions did not indicate that it was confused or tired out.  To the contrary, the jury asked the court to clarify some instructions; it pointed out typographical errors on the jury forms; and it wanted access to certain evidence.

¶ 184    We review the court's decision to admit this allegedly cumulative evidence for an abuse of discretion.  *People v. Pahlavan*, 83 P.3d 1138, 1140 (Colo. App. 2003).  "The fact that evidence is cumulative does not, by itself, render the evidence inadmissible." *Id.*  A court only abuses its discretion when it admits cumulative evidence if that decision is "manifestly arbitrary, unreasonable, or

unfair under the circumstances." *Id.* CRE 403 states that a court should avoid the "*needless* presentation of cumulative evidence." (Emphasis added.)

¶ 185    We conclude, for the following reasons, that the court did not abuse its discretion when it admitted the evidence that defendant describes as cumulative.

¶ 186    First, the testimony of various witnesses about the A.T. story was not needlessly cumulative. It was, instead, relevant to show different aspects of the story and to establish that defendant and Ms. Lowe had instructed the *other children* in the house to tell it to the authorities. (Remember that defendant had been charged with individual counts of contributing to the delinquency of each of these children.) It also was relevant to prove the conspiracy between defendant and Ms. Lowe.

¶ 187    Second, the testimony about the means that Ms. Lowe used to discourage the children, Ms. Graves, and Mr. Williams from speaking to the police — suggesting that defendant could get the death penalty for killing A.T. and that the government would take the children away — was not needlessly cumulative. It established

that Ms. Lowe had used these means in attempt to silence everyone who knew about A.T.'s fate.

¶ 188 Third, the testimony from various witnesses about the punishments that defendant and Ms. Lowe inflicted on the children was not needlessly cumulative because it addressed the multiple counts of child abuse in which each child was named as a victim.

¶ 189 Fourth, testimony from several witnesses about how A.T., in particular, was punished by being placed in a closet — when combined with a full-size model of the closet — corroborated the children's testimony and was not needlessly cumulative; it was relevant to disprove defendant's claim that the children had made up the details of A.T.'s and their own abuse.

¶ 190 Fifth, the evidence that defendant and Ms. Lowe lived in public housing, collected welfare, and had applied for the Florida timeshare was not needlessly cumulative because it explained why the police took certain steps in their investigation.

## V. The Trial Court Did Not Abuse Its Discretion When It Imposed Consecutive Sentences on the Misdemeanor Child Abuse Counts

¶ 191 The jury convicted defendant of six counts of misdemeanor child abuse. The victims were the six children, besides A.T., who had lived with defendant and Ms. Lowe.

¶ 192 The trial court sentenced defendant to twenty-four months, or the maximum, in the county jail on each count. The court then ordered that these sentences were to be served consecutively to each other, for a total of twelve years. The court then ordered defendant to serve those sentences consecutively to the prison sentences that the court had imposed on the other counts. The court added that the consecutive jail sentences would precede the prison sentences. We review a trial court's sentencing decisions for an abuse of discretion. *People v. Muckle*, 107 P.3d 380, 382 (Colo. 2005). Defendant contends that the trial court did not provide a reasonable explanation for its decision to order defendant to serve the misdemeanor sentences consecutively to the prison sentence and before the prison sentence. We conclude, for the following reasons, that the trial court did not abuse its discretion when it imposed the consecutive sentences.

¶ 193    First, the court generally stated that, among other things, the

"seriousness of the offense, the gravity of the offense, and the effects

on the children [were] the driving factor[s] in imposing sentence in

this case."  It added that "the level of abuse suffered by those

children" justified the maximum sentence on each count.

¶ 194    Second, the court also referred to section 18-1.3-501(1)(c),

C.R.S. 2016.  As *People v. Valadez*, 2016 COA 62, ¶ 11, points out,

this statute created a general rule and an exception.  The general

rule was that a court would not normally order a defendant to serve

a jail sentence for a misdemeanor consecutively to a prison

sentence for a felony.  *See id.*  The exception was that a court could

decide, "after consideration of all the relevant facts and

circumstances, that a concurrent sentence [was] not warranted."

§ 18-1.3.-501(1)(c).  It could then impose a consecutive

misdemeanor sentence.  *See Valadez*, ¶ 15.  If a concurrent

sentence was not warranted, the court "must toll the prison

sentence [and] order that the [consecutive] county jail

sentence . . . be served before the remainder of the prison

sentence."  *Id.* at ¶ 27.  "After fully serving the jail sentence, the

prisoner must then be transferred back" to prison "to serve the remainder of his prison sentence." *Id.*

¶ 195 Third, the misdemeanor sentences involved six different victims, and the prison sentences focused on the death of the seventh victim, A.T. *See People v. O'Dell*, 53 P.3d 655, 657 (Colo. App. 2001)(explaining that, when multiple victims are named in multiple convictions, the court has discretion to impose consecutive sentences); *see also People v. Howell*, 64 P.3d 894, 898 (Colo. App. 2002)(a trial court is only required to describe the basic reasons for imposing a particular sentence); *People v. Koehler*, 30 P.3d 694, 698 (Colo. App. 2000)(a trial court is not required to explicitly comment on each of the statutory factors that it considered).

## VI. Things That We Will Not Consider

### A. Attachments to the Opening Brief

¶ 196 Defendant attached five appendices to his opening brief. The prosecution asserts that these appendices constitute an improper attempt to provide additional legal authority and record citations outside of the word limit that a division of this court had previously authorized. We agree.

78

¶ 197   Defendant's opening brief initially contained almost 36,000 words and one appendix.  *See* C.A.R. 28(g)(1)("An opening . . . brief must contain no more than 9,500 words.").  A division of this court struck the opening brief, but it granted defendant leave to file an amended oversized brief containing no more than 25,700 words.  His amended opening brief fell just within this word limit, but the number of appendices quintupled, and they contained lengthy legal and record citations.

¶ 198   Given that the division authorized defendant to file an opening brief that was two-and-a-half times longer than the length established by C.A.R. 28(g)(1), we conclude that this addition of eighteen additional pages of appendices "makes a mockery of the rules that govern the length of briefs."  *Castillo v. Koppes-Conway*, 148 P.3d 289, 291 (Colo. App. 2006).  We therefore shall not consider the appendices, including any contentions in them that are not raised in the opening brief itself.  *See id.*; *Legro v. Robinson*, 2015 COA 183, ¶ 30 n.8.

B.    Insufficiently Developed Contentions

¶ 199   We also will not review contentions that have not been "sufficiently developed."  *See People v. Allman*, 2012 COA 212, ¶ 15;

*see also People v. Simpson*, 93 P.3d 551, 555 (Colo. App. 2003)("We decline to consider a bald legal proposition presented without argument or development . . . ."). So we will not address the following contentions that defendant raised in his opening brief.

- Defendant asserts that the trial court should not have followed section 16-10-110, C.R.S. 2016, and informed the jury that the prosecution was not seeking the death penalty as defendant's punishment. He contends that this statute was unconstitutional as applied to him.

  As far as we can tell from the record, defendant did not challenge the statute as it applied to him in the trial court. Instead, he generally objected to the statute's constitutionality. He said that "none of the cases that tested the statute in terms of constitutional fundamental fairness" had considered the statute when "the highest charge [was] a class two felony." He added that, because he was not facing a capital charge, "injecting the term death penalty into any of the rhetoric surrounding this case" could impair his right to a fair trial. He did not expand on these statements. (Our supreme court has already rejected

a facial challenge to the statute. *People v. Smith*, 848 P.2d 365, 369 (Colo. 1993).)

Defendant raised his as-applied challenges for the first time on appeal. He contends that the statute was unconstitutionally applied to him because the instruction invited the jury to (1) speculate why the death penalty was not sought; (2) presume that defendant may have "gotten off easy[]"; and (3) convict with impunity given that "there was no danger that [defendant] would be subject to the death penalty." But defendant (1) did not explain to the trial court how the instruction deprived him of a fair trial; and (2) admitted that he could not "tell the court what . . . effect [the instruction] will [have] on the jury"; and (3) did not describe any other constitutional problems that the statute may have presented as applied to him.

We will not consider these as-applied challenges because defendant did not develop any facts to support them in the trial court. *See People v. Patrick*, 772 P.2d 98, 100 (Colo. 1989)("We . . . stress that we cannot determine the as-applied constitutionality of a statute based upon an

incomplete record of the facts."); *People v. Veren,* 140 P.3d 131, 140 (Colo. App. 2005)("[I]t is imperative that the trial court make some factual record that indicates what causes the statute to be unconstitutional as applied.").

- Defendant contends that the prosecution's reference to the death penalty in its opening statement violated a trial court order. But he did not adequately develop this issue in the opening brief.

- Defendant asserts that the court's decision to allow multiple witnesses to testify about the same information violated CRE 403, and the sheer mass of the evidence "overwhelmed and traumatized the jury," thereby violating defendant's rights to due process and to a fair and impartial jury. But this contention is entirely speculative, so we will not address it.

- Defendant asserts that, by unduly lengthening the trial, the cumulative evidence "skew[ed]" the jury pool "in favor of those who would not be financially impacted by an estimated nine-week trial." The result of such "skewing" was to deny defendant his constitutional right to a fair

cross-section of the community.  The record does not

contain any proof of this assertion, and defendant only cites

a law review article to support it.

¶ 200   The judgment of conviction is affirmed.

JUDGE WEBB concurs in part and specially concurs in part.

JUDGE DUNN concurs in part and dissents in part.

JUDGE WEBB, concurring in part and specially concurring in part.

¶ 201 In general, I concur with Judge Bernard's opinion and specifically agree that the judgment of conviction should be affirmed. However, I write separately to offer two alternative reasons why defendant's argument that the trial court effectively denied him counsel of choice by conditioning payment of costs, such as for experts and investigators, on public defender representation fails.

- First, David Lane, while acting as defendant's pro bono counsel, invited any error.

- Second, where the General Assembly has limited the expenditure of public funds, under separation of powers principles that limitation cannot be circumvented by a chief justice directive (CJD).

¶ 202 Either of these reasons would avoid the novel constitutional analysis of the right to counsel that Judge Bernard presents, on which I take no position. *See Developmental Pathways v. Ritter*, 178 P.3d 524, 535 (Colo. 2008) ("[T]he principle of judicial restraint requires us to 'avoid reaching constitutional questions in advance of

the necessity of deciding them.'" (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988))).

## I. Invited Error

### A. Background

¶ 203    Shortly after the grand jury indicted defendant, the trial court held a hearing at which Mr. Lane spoke "on behalf of Aaron Thompson, who appears in custody." But rather than entering a general appearance, Mr. Lane argued:

- "Mr. Thompson is indigent and [he] can't pay for those ancillary services necessary to ensure that his rights under the 6th Amendment to the effective assistance of counsel are really protected."

- "[I]f the defendant is indigent, regardless of whether counsel has been retained for a dollar or a million dollars or is volunteering, the court is obligated to provide indigent [sic] services to the indigent defendant."

- "And the case in Colorado to the contrary stands alone in the country, and the case is cited as *People v. Cardenas*, [62] P.3d 621 [Colo. 2002] . . . ."

- "So what this Court has to wrestle with right now is, I am retained counsel, *Cardenas* says this Court has no authority to order ancillary services to be paid for by governmental funding for Mr. Thompson. But Mr. Thompson wants me to represent him, and under [*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006)], that rises to the level of constitutional significance."

- "[B]ecause Mr. Thompson cannot possibly get a fair trial without those [ancillary] services, if my being his lawyer will preclude that from happening, I, over objection, will step aside and ask that this Court appoint the Public Defender's Office . . . ."

¶ 204    Mr. Lane ended with, "[t]he Court, under *Cardenas*, can't give them to Mr. Thompson, so I'm throwing it now in the Court's lap." Then, when the trial court declined "the opportunity to overrule *Cardenas*," it sought to confirm that Mr. Lane would not be entering an appearance for defendant. Mr. Lane replied, "That's fair. And it's over Mr. Thompson's objection, Your Honor, under the 6th and 14th Amendments to the United States Constitution and analogous provisions of the Colorado Constitution."

¶ 205     Then the public defender entered an appearance for

defendant.

## B.  Law

¶ 206     "Generally, the invited error doctrine precludes appellate

review of errors created by a party." *People v. Gross*, 2012 CO 60M,

¶ 8.  This is so because a defendant "may not complain on appeal of

an error that he has invited or injected into the case; he must abide

the consequences of his acts." *People v. Zapata*, 779 P.2d 1307,

1309 (Colo. 1989).  Simply put, this doctrine "[o]perates to bar a

disappointed litigant from arguing on appeal that an adverse

decision below was the product of error, when that party urged the

lower court to adopt the proposition now alleged to be error."

*Horton v. Suthers*, 43 P.3d 611, 618 (Colo. 2002) (quoting *Brett v.*

*Great Am. Recreation*, 677 A.2d 705, 717 (N.J. 1995)).  Even so,

where "the error resulted from counsel's oversight, . . . the appeal

[i]s not precluded by the invited error doctrine."  *Gross*, ¶ 9.

¶ 207     But on the facts presented in *Gross*, the court held that invited

error prevailed over alleged attorney oversight.  It explained:

> In this case, however, defense counsel argued
> affirmatively for the initial aggressor
> instruction despite opposition by the

> prosecution. The invited error doctrine bars precisely such an intentional, strategic decision. This is especially true where the prosecutor objected to the proposed instruction. If this court were to extend the attorney incompetence exception to deliberate, strategic acts by counsel, then trial courts would be required to evaluate the propriety of counsel's trial strategy to determine whether to give a requested instruction. Such a result would be an untenable burden because assessing counsel's strategy does not fall within the purview of the trial court. Instead, where counsel's trial strategy is arguably incompetent, it should be challenged on grounds of ineffective assistance of counsel under Crim. P. 35(c).

*Id.* at ¶ 11.

¶ 208    Since *Gross*, the supreme court has not addressed whether a deliberate act by counsel would alone trigger invited error, leaving the choice between strategy and incompetence for postconviction inquiry. A division of this court has read *Gross* "to distinguish errors based on trial counsel's omission from those of commission in limiting appellate review." *People v. Foster,* 2013 COA 85, ¶ 36. "While appellate courts may review the former for plain error, the latter generally will be unreviewable." *Id.* Other divisions have agreed. *See People v. Riley*, 2016 COA 76, ¶ 9 ("In this case, defense counsel requested that the jury be instructed on the lesser

non-included offense of public indecency.  He now complains that the evidence is insufficient to support the charge he requested."); *People v. Becker*, 2014 COA 36, ¶ 20 ("The invited error doctrine does not, however, apply to errors that resulted from a defendant's inaction rather than affirmative conduct."); *People v. Zadra*, 2013 COA 140, ¶ 48 ("We may review errors based on trial counsel's omissions for plain error, but errors created by trial counsel are not reviewable.").

¶ 209    To be sure, as the dissent points out, "[t]rial judges are presumed to know the law and to apply it in making their decisions."  (Citation omitted.)  But the dissent cites no Colorado authority, nor am I aware of any, using this presumption to trump invited error.  Instead, the dissent quotes from *People v. Lara*, 103 Cal. Rptr. 2d 201, 220 (Cal. Ct. App. 2001).  But that court recognized "the court's duty can only be negated in that 'special situation' in which defense counsel deliberately or expressly, as a matter of trial tactics, caused the error."  *Id.* at 220.  And in Colorado, as discussed above, counsel's affirmative action obviates the tactical or inadvertence inquiry.

¶ 210    "Whether the invited error doctrine applies here is an issue we consider de novo."  *Becker*, ¶ 20.

## C.  Application

¶ 211    Everyone would agree that Mr. Lane acted affirmatively in juxtaposing defendant's need for public funding of expenses to obtain effective assistance of counsel against the *Cardenas* holding that such funding was available only to defendants who were represented by the public defender's office.  But did Mr. Lane inject the error defendant now argues on appeal — that the court should have ruled, sua sponte, that *Cardenas* has been superseded by Chief Justice Directive 04-04, Appointment of State-Funded Counsel in Criminal Cases and for Contempt of Court (amended Nov. 2014)?  That CJD allows the judicial department to pay "a defendant's court costs, expert witness fees, and/or investigator fees" if "[t]he defendant . . . is receiving *pro bono*, private counsel."  *Id.* at § V(D)(1)(b) (formerly § IV(D)(b)).

¶ 212    On the one hand, Mr. Lane did not mention the CJD.  Even so, arguments raised for the first time on appeal are generally subject to plain error review.  *See Reyna-Abarca v. People*, 2017 CO 15, ¶ 2 ("We now conclude that unpreserved double jeopardy claims can be

90

raised for the first time on appeal, and appellate courts should ordinarily review such claims for plain error.").

¶ 213　On the other hand, Mr. Lane presented the trial court with a dilemma: either decline to follow *Cardenas* because of an intervening Supreme Court decision and allow defendant to receive public funding for expenses while represented by Mr. Lane, or follow *Cardenas* and appoint the public defender to represent defendant so that defendant could receive such funding.  Thus, Mr. Lane did not merely make one argument while failing to make another argument that could, with the invariably perfect wisdom of hindsight, be raised on appeal.  Rather, in highlighting the consequences of following *Cardenas*, he told the trial court that there were only two possible resolutions.

¶ 214　To no one's surprise, the trial court considered itself bound by *Cardenas*, as the later Supreme Court decision Mr. Lane cited did not address either *Cardenas* or the question of limiting public funding of expenses to indigent defendants who are publicly represented.  *See People v. Martinez*, 254 P.3d 1198, 1202 (Colo. App. 2011) ("Defendant contends that the rationale of *Hinojos-Mendoza* may no longer apply after the decision by the

United States Supreme Court in *Melendez-Diaz v. Massachusetts* . . . . We disagree with the hypothetical suggestion attributed to the Supreme Court. Furthermore, we are bound by our supreme court's explicit holdings."); *cf. Day v. Apoliona*, 496 F.3d 1027, 1031 (9th Cir. 2007) (district courts are bound by circuit authority unless there is clearly irreconcilable intervening Supreme Court authority).

¶ 215 In sum, Mr. Lane urged the court to conclude that the outcome of his request for public funds was binary: either *Gonzalez-Lopez* had abrogated *Cardenas*, or *Cardenas* precluded defendant from receiving public funds for trial expenses unless he chose public defender representation. The court accepted this argument and selected one of the two options that Mr. Lane presented. But defendant now rejects Mr. Lane's argument that the law presented the court with only two options, and asserts that the trial court erred when it selected one of the options presented.

¶ 216 I discern no principled distinction between Mr. Lane's either/or proposal and defense counsel tendering two different versions of a jury instruction on the same subject, then urging that controlling precedent required the trial court to pick one or the other. After all, "courts[] rely upon the presentation of oral

92

argument by well-prepared attorneys to assist . . . in reaching an appropriate resolution of the often difficult questions presented in the cases before [them]." *In re Aguilar*, 97 P.3d 815, 818 (Cal. 2004). Because Mr. Lane presented these options as mutually exclusive, the invited error doctrine prevents defendant from raising a third option on appeal. *See Foster*, ¶ 25; *cf. United States v. Falcon*, 462 F. App'x 866, 868 (11th Cir. 2012) (unpublished opinion) (After defendant acknowledged in the district court that the "loss amount" was either $1.4 or $1.7 million, his appellate argument that the loss amount was actually zero was barred by invited error doctrine.).

¶ 217 For these reasons, I would decline to review defendant's new appellate argument that the CJD has superseded *Cardenas*.

## II. A CJD Cannot Supersede a Statutory Limitation on the Expenditures of General Funds

¶ 218 Even if invited error does not prevent us from considering defendant's argument that CJD 04-04 requires public funding of his defense expenses — a proxy for his counsel of choice argument — I would further conclude that, assuming this CJD gave defendant access to the public funding that he sought, it cannot supersede the

supreme court's contrary statutory interpretation in *Cardenas*. Two observations book end this conclusion.

¶ 219 First, the allocation of state general revenues is a plenary power of the General Assembly. *Colo. Gen. Assembly v. Lamm*, 700 P.2d 508 (Colo. 1985) (holding that governor's transfer of funds from executive departments for which funds were appropriated to other executive departments impermissibly infringed upon General Assembly's plenary power of appropriation, and therefore did not fall within inherent administrative authority of Governor over state budget). But sometimes, the General Assembly does more by specifying just how those funds may be spent. *Colo. Gen. Assembly v. Lamm*, 704 P.2d 1371, 1381 n.5 (Colo. 1985) ("The right of the [l]egislature to control the public treasury, to determine the sources from which the public revenues shall be derived and *the objects upon which they shall be expended*, to dictate the time, *the manner, and the means*, both of their collection *and disbursement*, is firmly and inexpugnably established in our political system." (quoting *Colbert v. State*, 39 So. 65, 66 (Miss. 1905))) (emphasis added). And in *Cardenas*, our supreme court held that the General Assembly had done just that as to public funding of defense costs for

defendants who qualified for public representation. 62 P.3d at 622-23.

¶ 220    Second, by statute, indigent defendants charged with a crime "are entitled to legal representation and supporting services at state expense." § 18-1-403, C.R.S. 2016. In *Cardenas*, the supreme court addressed the trial court's refusal to provide an interpreter at state expense. 62 P.3d at 622. Although the defendant, who claimed to speak only Spanish, was represented by private pro bono counsel who did not, the supreme court affirmed the trial court in denying the indigent defendant's request for these services. *Id.* at 623. *Cardenas* acknowledged that "indigent defendants are entitled to state-paid legal representation and supporting services." *Id.* at 622. Still, it concluded that if an indigent defendant "wants the state to pay the costs of his attorney and supporting services, his *only choice* is to be represented by the public defender, or . . . a state-appointed alternate defense counsel." *Id.* at 623 (emphasis added).

¶ 221    The supreme court could have decided the case narrowly by deferring to trial court discretion. Instead, it came to this

conclusion more broadly, as a matter of statutory interpretation, in three steps.

- First, it noted the cross-reference in the statute to "in the manner provided for in articles 1 and 2 of title 21, C.R.S."[1] *Id.* at 622.

- Second, it pointed out that "[t]he General Assembly has created an agency charged with providing legal representation and services to indigent defendants: the office of state public defender [which,] upon application from a defendant, is required to make a determination that the defendant is indigent before he may obtain the services of that office." *Id.* at 623.

- Third, because the defendant "has not applied for the services of the public defender," instead "cho[osing] to be represented by [pro bono counsel]," it held that he had placed himself on a different path for obtaining support services. *Id.*

¶ 222    But despite this statutory interpretation, can a later CJD create a hybrid path to the same end?  Specifically, CJD 04-04

---

[1] *See* §§ 21-1-101 to -106, C.R.S. 2016 (public defender); §§ 21-2-101 to -107, C.R.S. 2016 (alternate defense counsel).

section V(D)(1)(b) permits public funding of expenses when "[t]he defendant is indigent and receiving *pro bono*, private counsel." I would say "no," for the following reasons.

¶ 223 "In Colorado, the General Assembly has retained the power to formulate the state's budget." *Colo. Gen. Assembly v. Owens*, 136 P.3d 262, 265 (Colo. 2006). And, "'[n]o moneys in the state treasury shall be disbursed . . . except upon appropriations made by law, or otherwise authorized by law.'" *People v. Nelson*, 2015 CO 68, ¶ 38 (quoting Colo. Const. art. V, § 33), *cert. granted sub nom. Nelson v. Colorado*, 579 U.S. __, 137 S. Ct. 30 (2016). The judicial department enjoys no exception — a court must "follow the statutes' instructions on how that money may be used." *Id.* at ¶ 39.

¶ 224 As interpreted in *Cardenas*, 62 P.3d at 622-23, the General Assembly has provided a framework to fund representation and support costs for indigent defendants.[2] "[W]e are bound by the

[2] Although the judicial department collects some revenue directly, such as through court filing fees, Chief Justice Directive 04-04, Appointment of State-Funded Counsel in Criminal Cases and for Contempt of Court (amended Nov. 2014), does not indicate that any of the funding for expanded support services comes from such sources, as opposed to from the department's general fund budget allocation. *See People v. Orozco*, 210 P.3d 472, 476 (Colo. App.

supreme court's interpretation of [a] statute." *People v. Nerud*, 2015 COA 27, ¶ 20. But by authorizing the expenditure of state funds on defendants who are represented by separate counsel, the CJD exceeds the statutory boundaries recognized in *Cardenas*.[3]

---

2009) ("Under CJD 04-04 § IV(D)(c) [currently § V(D)(1)(c)], payment from the Judicial Department's budget is appropriate."). Even so, the dissent suggests that the record is insufficiently developed to conclude that defense costs come from general funds allocated to the judicial department. But Thompson's supplemental brief did not raise this concern. To the contrary, it said,

> [i]n the fiscal year 2006-2007, the year relevant to this case, the General Assembly appropriated funds for 'the ordinary operating costs of the executive, legislative and judicial departments of the state.' *See* H.B. 06-1385, 65th Gen. Assemb. 2d Reg. Sess., Ch. 394 at 2498 (2006). Included within the appropriations is a fund for 'trial court programs,' which later appropriations clarify as including 'Court Costs, Jury Costs, and Court-appointed Counsel.' *See* H.B. 06-1385 at 2624-25; H.B. 16-1243, 7th Gen. Assemb., 2d Reg. Sess., Ch. 375 at 16 (2016). Thus, the legislature specifically granted the judicial department an appropriation to fund trial court programs, and did not place limitations on the funding of indigent defense.

[3] Apart from separation of powers, where a statute provides a means for doing something, principles of statutory interpretation disfavor reading into it an entirely different means for doing the same thing. *See Hiner v. Johnson*, 2012 COA 164, ¶ 19 ("Because C.R.C.P. 102(a) expressly refers to the property of defendants, but

¶ 225    To be sure, the Chief Justice is the executive head of the judicial department and "implements her administrative authority by means of Chief Justice Directives, under the supreme court's general superintending power over the court system." *Office of State Court Adm'r v. Background Info. Servs., Inc.*, 994 P.2d 420, 430-31 (Colo. 1999).  However, this authority has limits.  *Cf. Colo. Common Cause v. Gessler*, 2012 COA 147, ¶ 18 ("[An] agency does not have the authority to promulgate rules that modify or contravene statutory or constitutional provisions."), *aff'd*, 2014 CO 44; *Colo. Consumer Health Initiative v. Colo. Bd. of Health*, 240 P.3d 525, 528 (Colo. App. 2010) (An exercise of administrative authority "may not modify or contravene an existing statute, and any rule that is inconsistent with or contrary to a statute is void.").

¶ 226    "[S]eparation of powers requires that the co-equal branches of government, the executive, legislative, and judicial, exercise only

does not refer to the property of plaintiffs in cases in which defendants do not assert a counterclaim, we apply the canon of statutory interpretation expressio unius exclusio alterius — 'the inclusion of certain items implies the exclusion of others.'") (citation omitted); *see also Harrah v. People ex rel. Attorney Gen. of Colo.*, 125 Colo. 420, 426, 243 P.2d 1035, 1038 (1952) ("[W]e cannot by implication read into it words that are not present, nor supply remedies not clearly provided by language employed in the act.").

their own powers and not usurp the powers of another co-equal branch of government." *People v. Hollis*, 670 P.2d 441, 442 (Colo. App. 1983). That said, "the judicial branch of government possesses the inherent power to determine and compel payment of those sums of money which are reasonable and necessary to carry out its mandated responsibilities." *Pena v. Dist. Court*, 681 P.2d 953, 956 (Colo. 1984). But I discern no basis for concluding, especially after *Cardenas*, that "mandated responsibilities" of the judicial branch include providing public funding to privately represented, indigent defendants who can obtain that funding merely by accepting public defender or alternate defense counsel representation.

¶ 227    In resolving conflicts between statutes and court rules, the distinction between procedure — where the rule controls — and substance — where the statute controls — marks the boundary. *See People v. Prophet*, 42 P.3d 61, 62 (Colo. App. 2001). And "rules adopted to permit the courts to function efficiently are procedural." *Id.*

¶ 228    In contrast, substantive law creates, defines, and regulates rights and duties. *Id.* As relevant here, section 18-1-403 regulates

an indigent defendant's right to a state-funded defense. For such defendants, that right has constitutional significance. Thus, because section 18-1-403 deals with more than mere procedure or court efficiency, the CJD must yield to the statute.

¶ 229    In sum, because the General Assembly has chosen to restrict disbursement of general funds for support services to indigent defendants who are publicly represented, in my view a CJD may not provide for disbursement of the same funds where representation is by private pro bono counsel.

¶ 230    For the foregoing reasons, I concur with Judge Bernard that the judgment of conviction should be affirmed.

JUDGE DUNN, concurring in part and dissenting in part.

¶ 231　On a fall day in 2005, Mr. Thompson reported that his daughter, A.T., had run away. Early on, however, the police began to suspect that A.T. was actually dead and that Mr. Thompson was involved in her death. During the two-year police investigation that followed, David Lane, a private defense attorney, represented Mr. Thompson. After a grand jury indicted Mr. Thompson, the trial court concluded that, should Mr. Lane continue to represent Mr. Thompson as private counsel, the court had no authority to authorize state-funded support services. The trial court was mistaken. The upshot of this mistake was that — although Mr. Lane was Mr. Thompson's counsel of choice — Mr. Lane ceased representing Mr. Thompson.

¶ 232　Because I conclude that the trial court had discretion to consider and authorize the requested support services, I do not see this case as presenting a choice between competing constitutional rights. Colorado does not require an indigent defendant to choose between ancillary support services and his counsel of choice. Much to the contrary, an indigent defendant in this state may be represented by a private, pro bono attorney and still receive

102

state-funded support services. Given this, I find it unnecessary to tread the same constitutional path as my valued colleague writing for the majority. My focus is admittedly much narrower. In my view, because the trial court erred in failing to recognize its authority to consider and authorize the requested support services, Mr. Thompson effectively was deprived of his Sixth Amendment right to the counsel of his choice. Mindful that my colleagues disagree with this conclusion, albeit for different reasons, I respectfully dissent from Part II of the majority opinion.

## I.    The Request for State-Funded Support Services

¶ 233    At Mr. Thompson's first court appearance, Mr. Lane entered his appearance "with an asterisk" and explained that he had been representing Mr. Thompson "for about two years," Mr. Thompson wanted Mr. Lane to continue to represent him, and Mr. Lane was willing to continue to do so. Mr. Lane then asked the court to authorize state-funded expert and investigative services, which he contended were necessary to represent Mr. Thompson effectively. But, he continued, "[I]f this [c]ourt won't do that, I'm registering an objection under the 6th and 14th Amendments to the United States Constitution." And he stated that, "over objection, [he would] step

aside" to allow Mr. Thompson these services through court-appointed counsel.

¶ 234    Despite Mr. Lane's plea for state-funded support services, he also told the court that it did not have the authority to grant his request because the Colorado Supreme Court prohibited it under *People v. Cardenas*, 62 P.3d 621 (Colo. 2002).  Still, Mr. Lane suggested the trial court could authorize the services because *Cardenas* was inconsistent with an intervening United States Supreme Court case, *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006), which, he asserted, recognized the constitutional significance of depriving a defendant of his counsel of choice.

¶ 235    Mr. Lane summarized his request for state-funded services by arguing that, "under *Gonzale*[*z*]-*Lopez*," Mr. Thompson "wants me to be his lawyer of constitutional significance."  But, Mr. Lane added, "[Mr. Thompson] needs these [state-funded support] services," and "[t]he [c]ourt, under *Cardenas*, can't give them to [him]."  As a result, Mr. Lane finished, "I'm throwing it now in the [c]ourt's lap."

¶ 236    Thanking Mr. Lane for "the opportunity to overrule *Cardenas*," the trial court "respectfully declined."  The court then stated that it was "not going to rule on the issue of ancillary services."  And the

court stated its understanding that, "based on [its] nonruling on ancillary services, [Mr. Lane would] not enter[] [his] appearance at that point, understanding [Mr. Lane had] made [his] record." Mr. Lane acknowledged the court's summary was "fair" but again reminded the court that it was "over Mr. Thompson's objection . . . under the 6th and 14th Amendments to the United States Constitution and analogous provisions of the Colorado Constitution."

¶ 237    As it goes, I find no fault in the trial court's view of *Cardenas*. *Cardenas* considered whether a trial court abused its discretion in declining to authorize state-funded interpreter services to a defendant represented by private, pro bono counsel. *Cardenas*, 62 P.3d at 622. In doing so, it construed Colorado's indigent defense services statute, section 18-1-403, C.R.S. 2016.[1] And it concluded

---

[1] Colorado's indigent defense services statute states that indigent defendants charged with a crime "are entitled to legal representation and supporting services at state expense." § 18-1-403, C.R.S. 2016. Unlike other indigent defense services statutes, Colorado's statute does not expressly prohibit an indigent defendant represented by private counsel from receiving state-funded support services. *Cf.* Utah Code Ann. § 77-32-303(2) (West 2012) (Where a defense services provider is available, a court "may not order" and "may not provide defense resources for a

that, under that statute, if an indigent defendant "wants the state to pay the costs of his attorney and supporting services, his only choice is to be represented by the public defender, or . . . a state-appointed alternate defense counsel." *Cardenas*, 62 P.3d at 622-23.

¶ 238   So if *Cardenas* were the end of the story, I would agree with the majority's outcome. After all, neither this court nor the trial court can overrule *Cardenas*.

¶ 239   But *Cardenas* should not have ended the inquiry. After *Cardenas* was decided — but several years before Mr. Thompson's indictment — the Chief Justice of the Colorado Supreme Court issued a directive expanding the circumstances under which state-funded support services may be provided to indigent defendants. *See* Chief Justice Directive 04-04, Appointment of State-Funded Counsel in Criminal Cases and for Contempt of Court, § V(D) (amended Nov. 2014) (CJD 04-04) (formerly § IV(D)); *see also People v. Stroud*, 2014 COA 58, ¶ 8 (recognizing that CJD

---

defendant who has retained private counsel" except in circumstances outlined in the statute.). It is simply silent on the issue.

04-04 "expanded the circumstances in which support services may be provided").

¶ 240    The CJD plainly provides that "[i]n certain circumstances, a defendant's court costs, expert witness fees, and/or investigator fees may be paid by the Judicial Department even though the defendant is not represented by state-funded counsel."[2] CJD 04-04 § V(D).  The directive allows courts to authorize the judicial department to pay for these support services, if any of the following applies:

> a) [t]he defendant is indigent and proceeding *pro se*;
>
> b) [t]he defendant is indigent and receiving *pro bono*, private counsel;
>
> c) [t]he defendant is receiving private counsel but becomes indigent during the course of the case, and the court has determined that the defendant lacks sufficient funds to pay for court costs and that it would be too disruptive to the proceedings to assign the Public Defender or Alternate Defense Counsel to the case.

*Id.*

---

[2] Since its 2004 inception, CJD 04-04 has allowed courts to authorize state-funded support services for indigent defendants represented by pro bono, private counsel.

¶ 241    It is hardly remarkable to conclude that a trial court's failure

to recognize its discretion under CJD 04-04 is an abuse of

discretion.  Two divisions of this court have already so concluded.

*Stroud*, ¶ 12; *People v. Orozco*, 210 P.3d 472, 476 (Colo. App. 2009).

In both cases, the defendants were indigent and represented by

private counsel.  *Stroud*, ¶ 10; *Orozco*, 210 P.3d at 474.  Each

defendant requested state-funded expert witness services.  *Stroud*,

¶ 10; *Orozco*, 210 P.3d at 474.  And each trial court denied the

requests under the mistaken belief that they had no authority to

grant the requested state-funded services.  *Stroud*, ¶ 11; *Orozco*,

210 P.3d at 475.  On appeal, separate divisions of this court held

that the denial of the requested services without considering CJD

04-04 was an abuse of discretion.  *Stroud*, ¶ 12; *Orozco*, 210 P.3d at

476.  Because each defendant continued with his private attorney,

this court reviewed the denial of the requested support services for

constitutional harmless error.  *Stroud*, ¶ 14; *Orozco*, 210 P.3d at

476.  In *Stroud*, the error was constitutionally harmless.  *Stroud*,

¶ 17.  In *Orozco*, it was not, and the defendant's convictions for

incest and sexual assault on a child were reversed.  *Orozco*, 210

P.3d at 477.

¶ 242    Consider then Mr. Lane's statements to the trial court that:
(1) he was Mr. Thompson's retained counsel;[3] (2) he had been
representing Mr. Thompson "for about two years"; (3) Mr.
Thompson was indigent but wanted Mr. Lane to continue
representing him; (4) he would continue to represent Mr.
Thompson; but (5) in order to do so effectively, he needed the court
to authorize state-funded support services.  These statements
should have alerted the trial court that CJD 04-04 was at play and
that it allowed the court to consider — and, if appropriate, to
authorize — Mr. Lane's request for state-funded services.

¶ 243    True, neither Mr. Lane nor the prosecution brought CJD
04-04 to the trial court's attention.  But that was also true in *Stroud*
and implied in *Orozco*.  *See Stroud*, ¶ 12 (acknowledging the parties
did not bring CJD 04-04 to the court's attention); *Orozco*, 210 P.3d
at 475 (concluding that the trial court was mistaken that "no
mechanism existed under the law to provide the necessary funds"
for state-funded expert witness services).  Put simply, the
conclusion that the trial court abused its discretion is no different

---

[3] Although Mr. Lane used the word "retained," the parties agree that
Mr. Lane was representing Mr. Thompson pro bono.

here than it was in *Stroud* and *Orozco*. *See People v. Darlington*, 105 P.3d 230, 232 (Colo. 2005) (The "failure to exercise discretion is itself an abuse of discretion."); *accord DeBella v. People*, 233 P.3d 664, 668 (Colo. 2010).[4]

¶ 244    I am tempted to agree with my respected specially concurring colleague's conclusion that Mr. Lane invited any error in framing the issue the way he did. But for two reasons, I can't. First, Mr. Lane did not affirmatively misstate the law. His summary of *Cardenas* was accurate. The most I can glean from the record is that he was either unaware of CJD 04-04 or neglected to raise it. But errors of omission are reviewable under Crim. P. 52(b). *See People v. Gross*, 2012 CO 60M, ¶ 16 (stating that errors resulting from the attorney's "oversight or inadvertent omission" are not precluded under the invited error doctrine but are reviewed for plain error); *People v. Foster*, 2013 COA 85, ¶¶ 34-40

---

[4] Had the trial court recognized its discretion, it could have then considered whether Mr. Lane's general request was sufficient to show that the requested support services were reasonable, necessary, and helpful to the defense. *See People v. Mossmann*, 17 P.3d 165, 171 (Colo. App. 2000). Given that the court did not recognize or exercise its discretion, I cannot agree with the People that because Mr. Lane's showing was insufficient the trial court did not abuse its discretion.

(distinguishing between errors of commission and those of omission and concluding the latter are reviewable for plain error).

¶ 245 Second, defense counsel's inadvertence or ignorance of the law does not relieve a trial court from knowing and applying the law. *People v. White*, 870 P.2d 424, 440 (Colo. 1994) ("Trial judges are presumed to know the law and to apply it in making their decisions.") (citation omitted); *see also People v. Lara*, 103 Cal. Rptr. 2d 201, 220 (Cal. Ct. App. 2001) (Absent some evidence of deliberate trial tactics, "[e]ven in the context of invited error, . . . the trial court rather than defense counsel has the ultimate duty to apply the correct law."). Because Chief Justice Directives are an expression of judicial branch policy and must be "given full force and effect in matters of court administration," *Hodges v. People*, 158 P.3d 922, 926 (Colo. 2007), I presume too that trial courts know what the directives say. As well, an attorney's ignorance or inadvertence should not excuse a trial court from knowing the scope of its discretion. *See, e.g., Stroud*, ¶ 12; *Orozco*, 210 P.3d at 476.

¶ 246 One final observation. Although my specially concurring colleague questions the Chief Justice's authority to issue CJD

04-04 section V(D), the People did not initially mount a constitutional — or any — challenge to the legality of CJD 04-04.[5] Because no party raised or argued that the CJD violates separation of powers principles (or is inconsistent with section 18-1-403), either at trial or in the original appellate briefs, I would reserve consideration of such issues for another case and another time.[6] *E.g.*, *People v. Lybarger*, 700 P.2d 910, 915 (Colo. 1985) (It is "[a]xiomatic to the exercise of judicial authority . . . that a court should not decide a constitutional issue unless and until such issue is actually raised by a party to the controversy and the necessity for such decision is clear and inescapable."); *People v. Bondsteel*, 2015 COA 165, ¶ 30 (*cert. granted* Oct. 31, 2016) (same).

---

[5] After oral argument, and on its own initiative, this court invited the parties to respond to a limited inquiry about CJD 04-04.

[6] Because the parties did not raise the issue, the record leaves unanswered questions such as: (1) What funds are used to pay support services? (2) If paid with judicial department funds, are those funds general funds? (3) If so, are funds paid for state-funded support services reasonable and necessary to carry out the judicial department's mission? (4) If they are reasonable and necessary, then what is the impact of our supreme court's conclusion that in a separation of powers battle involving the payment "of those sums of money which are reasonable and necessary to carry out its mandated responsibilities[,]" the judiciary wins? *See Pena v. Dist. Court*, 681 P.2d 953, 956-57 (Colo. 1984).

¶ 247　At the end of it all, the trial court's misapprehension of its authority to consider and authorize state-funded support services effectively resulted in a deprivation of Mr. Thompson's counsel of choice.　The only remaining question is whether the court's error requires reversal.

## II.　Deprivation of Mr. Thompson's Counsel of Choice

¶ 248　The Sixth Amendment right to counsel, along with the right to counsel of one's choice, form the "root meaning of the constitutional guarantee" of the Sixth Amendment.　*Gonzalez-Lopez*, 588 U.S. at 147-48.　When a defendant is deprived of these rights, no further showing of prejudice is necessary — the deprivation of counsel of one's choice is the loss of a constitutional right.　*See id.* at 148; *see also Anaya v. People*, 764 P.2d 779, 783 (Colo. 1988).

¶ 249　I, of course, agree that an indigent defendant does not have the same range of choices as a defendant who can pay.　For instance, an indigent defendant may not insist on representation by an attorney that he cannot afford or who declines to represent him.　*Wheat v. United States*, 486 U.S. 153, 159 (1988).　Nor may an indigent defendant select his court-appointed counsel.　*E.g.*, *Gonzalez-Lopez*, 548 U.S. at 151.　Once an indigent defendant has

obtained counsel, however, the defendant's choice of continued representation by appointed counsel is "afforded great weight." *People v. Nozolino*, 2013 CO 19, ¶ 17; *accord Rodriguez v. Dist. Court*, 719 P.2d 699, 707 (Colo. 1986); *see also Williams v. Dist. Court*, 700 P.2d 549, 555 (Colo. 1985) ("[Indigent defendants] are entitled to continued and effective representation by court appointed counsel . . . ."); *People v. Isham*, 923 P.2d 190, 193 (Colo. App. 1995) ("When counsel is retained, there is a presumption in favor of a defendant's choice of counsel.").

¶ 250    But what happens when an indigent defendant secures private counsel at no cost to the state?  More to the point, does the Sixth Amendment right to counsel of choice attach?  I think so.  Once the parties enter an attorney-client relationship, I see no material difference between an indigent defendant and one who can pay. *See Ingram v. Justice Court*, 447 P.2d 650, 655 (Cal. 1968) ("[O]nce counsel is appointed or undertakes to represent an indigent defendant, whether it be the public defender or a volunteer private attorney, the parties enter into an attorney-client relationship which is no less inviolable than [if] counsel had been retained.") (citation omitted).  The attorney-client relationship is real even if the

defendant is impoverished. And in such a scenario, the indigent defendant's choice of counsel has the same constitutional significance as a defendant with the ability to pay. I can't reconcile a different outcome with the Supreme Court's declaration that "the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney . . . who is willing to represent the defendant even though he is without funds." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624-25 (1989); *accord Gonzalez-Lopez*, 548 U.S. at 144. Taking that statement at face value, I conclude that if a private attorney agrees to represent an indigent defendant pro bono, the Sixth Amendment right to counsel of choice attaches.

¶ 251 And in this view, I do not stand entirely alone. *See Robinson v. Hotham*, 118 P.3d 1129, 1133 (Ariz. Ct. App. 2005) (concluding that where an indigent defendant is able to obtain representation by non-publicly funded counsel, he possesses "rights under the Sixth Amendment"); *English v. Missildine*, 311 N.W.2d 292, 294 (Iowa 1981) ("[N]o reason exists for depriving an indigent of the same right of choice [of counsel] as a person of means when the indigent is able to obtain private counsel without public expense."); *State v.*

*Sims*, 968 So. 2d 721, 722 (La. 2007) ("The right to private, non-appointed counsel of choice does not distinguish between a paid attorney and a pro bono lawyer."); *State v. Jones*, 707 So. 2d 975, 977 (La. 1998) (same); *State v. Brown*, 134 P.3d 753, 759 (N.M. 2006) ("[A]n indigent defendant represented by *pro bono* counsel, is entitled . . . to the constitutional right to counsel."); *accord Moore v. State*, 889 A.2d 325, 349-366 (Md. 2005) (Bell, C.J., dissenting).

¶ 252 Because the trial court misapprehended its discretionary authority to award state-funded support services, Mr. Lane discontinued his representation of Mr. Thompson. The court's error therefore effectively denied Mr. Thompson his Sixth Amendment right to his counsel of choice. The United States Supreme Court tells us that this error is structural and requires reversal. *Gonzalez-Lopez*, 548 U.S. at 150.

¶ 253 Make no mistake; I recognize the evidence overwhelmingly showed that Mr. Thompson horribly abused these children and that he conspired with Ms. Lowe to commit the crimes of which he was convicted. The Sixth Amendment to the United States Constitution, however, applies not just to the innocent.

¶ 254   Knowing that under my analysis a retrial would be necessary and that many of Mr. Thompson's remaining issues would likely arise on remand, I otherwise agree in full with my colleagues' considered resolution of those issues.

¶ 255   From Part II of the majority opinion, I respectfully dissent.