22CA1421 Peo v Eastman 04-16-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1421
Weld County District Court No. 20CR461
Honorable Marcelo A. Kopcow, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Kevin Dean Eastman,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE DUNN
Harris and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 16, 2026

Philip J. Weiser, Attorney General, Jacob R. Lofgren, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Joseph Paul Hough, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Kevin Dean Eastman appeals his convictions for two counts of first degree murder, two counts of tampering with a deceased human body, and two counts of tampering with physical evidence. He contends that reversal is required because the district court erred by (1) denying his motion to suppress evidence gathered from a tracking device installed on his car and (2) admitting other act and hearsay evidence. We affirm.

## I.     Background

¶ 2     For several years, Eastman and Heather Frank were in an on-and-off relationship. But in late December 2019, Frank ended the relationship. According to Eastman, before this breakup, they "treat[ed] each other bad," and he was physically abusive.

¶ 3     Shortly after the breakup, Frank met Scott Sessions and the two exchanged messages suggestive of a budding relationship.

¶ 4     On February 8, 2020, Eastman went to Frank's apartment in Greeley. Eastman said that when he got there, Frank told him she had a date that night. That same evening, a message was sent from Frank's Facebook account inviting Sessions to come over. Sessions said he would be there soon.

¶ 5     A few days later, on February 10, Sessions's partially burned body was found in Pingree Park. An autopsy showed that before he was set on fire, Sessions's jugular vein had been slashed. The trajectory of the neck wound along with limited defensive wounds were consistent with an ambush from behind.

¶ 6     Investigators quickly learned about the messages between Sessions and Frank. And a review of Sessions's cell phone records confirmed that he was "in and around" Frank's apartment the evening of February 8. The phone records also showed that Sessions's phone stopped signaling early the next morning.

¶ 7     Continued investigation also uncovered Frank's relationship with Eastman. A review of his cell phone records confirmed that Eastman was also "in and around" Frank's apartment the evening of February 8. Cell phone records also showed that early the next morning, Frank's and Eastman's phones travelled together away from Greeley and toward the Pingree Park area.

¶ 8     Four days after the discovery of Sessions's body, and after seeing Eastman's car parked outside Frank's apartment, investigators obtained a warrant to place a GPS tracking device on

Eastman's car.  They also placed a surveillance camera outside Frank's apartment.

¶ 9     On the evening of February 15, the surveillance camera showed Frank and Eastman leave in Eastman's car.  Investigators then tracked Eastman's car to his employer's property and to some stops around that property.

¶ 10     The next morning, an officer went to the property, where he saw a smoke plume and Eastman tending a fire near a burn pit.  Concerned that Eastman was tampering with or destroying evidence related to the Sessions homicide, the officer followed Eastman to a gas station and arrested him.  Officers then searched Eastman and found, among other things, a fixed-blade knife, two spent .22 caliber shell casings, and three live .22 caliber shells.

¶ 11     Meanwhile, other officers searched the property where the fire had been observed.  There, they found Frank's body next to the burn pit.  Frank had been shot twice in the chest and was wrapped in plastic and bailing wire.  Frank's autopsy revealed a bullet lodged in her chest that was consistent with a "small caliber," such as a .22.

¶ 12    During a recorded police interview, Eastman admitted that he was at Frank's apartment on February 8, someone was "hurt," there was a "big mess," and blood was "fucking everywhere."  Eastman never admitted to hurting or killing Sessions, though he muttered things like, "there was a lot of fucked up shit that should never [have] happened that happened."  Eastman denied knowing anything about Frank's death.

¶ 13    The prosecution charged Eastman with two counts of first degree murder, two counts of tampering with a deceased human body, and two counts of tampering with physical evidence.[1]

¶ 14    Eastman didn't testify at trial, but his counsel defended on the theory that Frank killed Sessions and that when Eastman arrived at her home, he helped clean the murder scene and dispose of Sessions's body.  Eastman's counsel also advanced the theory that Eastman's employer helped dispose of Sessions's body but then panicked, killed Frank, and hid her body on his property.

---

[1] The prosecution also charged Eastman with possession of a weapon by a previous offender but later dismissed that count.

¶ 15    The jury convicted Eastman as charged, and the court sentenced him to a controlling sentence of life in prison without the possibility of parole.

## II.    Motion to Suppress

¶ 16    Eastman contends that the district court reversibly erred by denying his "motion to suppress incriminating evidence gathered by GPS tracking."  We aren't persuaded.

### A.    Additional Procedural Background

¶ 17    Before trial, Eastman filed a motion to suppress evidence obtained from the GPS tracking device.  He argued that (1) the affidavit submitted in support of the warrant did not establish probable cause; (2) the warrant lacked particularity; and (3) the good faith exception to the exclusionary rule did not apply.

¶ 18    The district court denied the motion to suppress.  It rejected Eastman's argument that the affidavit did not establish probable cause.  But it agreed that the warrant lacked particularity because it did not include any "limitation on the length of time" the tracker would be installed.  Even so, it concluded that under the good faith exception the warrant was not so "facially deficient" that it was objectively unreasonable for an officer to rely on it.

¶ 19    On appeal, Eastman does not challenge the court's ruling that the officers acted in good faith in executing the warrant even though it lacked temporal particularity.  Instead, he argues only that the court erred by denying the motion to suppress because the affidavit supporting the warrant to install the device failed to establish probable cause.

### B.    Legal Principles and Standard of Review

¶ 20    The Fourth Amendment protects people from unreasonable searches and generally requires the police to obtain a warrant supported by probable cause before conducting a search.  *People v. Tafoya,* 2021 CO 62, ¶ 24; U.S. Const. amend. IV; *see* Colo. Const. art. II, § 7.  Installing a tracking device on a vehicle constitutes a search and requires a warrant.  *See United States v. Jones,* 565 U.S. 400, 404 (2012).  Thus, the installation of a tracking device on a car must be supported by probable cause.  *See id.*; *People v. Seymour,* 2023 CO 53, ¶¶ 41-42 (noting that a valid warrant must "demonstrate[] probable cause").

¶ 21    To establish probable cause for a search warrant, an affidavit must contain sufficient facts to allow a person of reasonable caution to believe that evidence of criminal activity is located at the

place to be searched. *Seymour*, ¶ 54. This means that an affidavit "must establish a nexus between the alleged criminal activity and the place to be searched." *Id.* Direct evidence of a nexus isn't required. *People v. Green*, 70 P.3d 1213, 1215 (Colo. 2003). Rather, "[t]he link between the suspected crime and the place to be searched can be established by circumstantial evidence" and "commonsense inferences" drawn from the facts. *Id.* at 1214-15; *see People v. McKay*, 2021 CO 72, ¶ 8.

¶ 22 On review, "the central question" is whether there was a substantial basis to issue the warrant. *McKay*, ¶ 10. And the probable cause determination is entitled to "great deference." *Id.*

¶ 23 The district court's denial of a motion to suppress presents a mixed question of fact and law. *Seymour*, ¶ 19. We defer to the court's factual findings if they are supported by competent evidence, but we review the legal effect of those findings de novo. *Id.*

C. The Affidavit Was Sufficient to Establish Probable Cause

¶ 24 We conclude that based on the facts alleged in the ten-page affidavit together with the reasonable inferences from those facts,

7

the court had a substantial basis to issue a warrant to install a GPS tracker on Eastman's car.

¶ 25　Among other things, the affidavit alleged the following facts and circumstances:

- Sessions arranged to meet at Frank's apartment the evening of February 8.

- Eastman and Frank had a relationship dating back several years.

- Eastman had an outstanding warrant for assault and domestic violence against Frank.

- Eastman had a criminal history, including domestic violence, assaults involving weapons, felony menacing, and carrying concealed weapons.

- Sessions's partially burned body was discovered near Pingree Park Road in Larimer County two days after he arranged to meet Frank.

- An autopsy showed Sessions "suffered a fatal injury to his neck" and ruled the manner of death a homicide.

- Crime scene footwear impressions showed at least two "adult male" individuals were near the body.

- A vehicle with a wheel width of "approximately" seventy-two inches was used to transport the body to the scene.

- Eastman's car had a wheel width of "approximately" seventy-one inches.

- Surveillance photos from the Mishawaka Center in Larimer County showed a vehicle matching Eastman's the day before Sessions's body was found in Larimer County.[2]

- Two days *after* Sessions's body was found, parking lot surveillance video near Frank's apartment captured Sessions's car enter and park in the lot. The video then showed an individual exit the car and head in the direction of Frank's apartment.

¶ 26    The affidavit requested a warrant to install the GPS tracking device on Eastman's car to assist investigators with the homicide

---

[2] The affidavit specifically identifies the Mishawaka Event Center and attaches a photo of a car matching Eastman's car taken from the center's security camera. Though the affidavit doesn't list the address of the event center, we take judicial notice that it is in Larimer County, Colorado. *See* CRE 201(b)(2) (a court may take judicial notice of an adjudicative fact that is not subject to reasonable dispute because it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

investigation and asserted that the tracker could lead investigators to persons involved in the homicide and evidence that had not yet been located.  These facts along with the reasonable and commonsense inferences drawn from them are sufficient to establish a specific nexus that connects Eastman to Sessions and the discovery of Sessions's body.  To the extent Eastman suggests that the affidavit was insufficient because it "most certainly did not show that Eastman was probably involved in [Sessions's] murder" and that evidence of that crime would "most likely" be found by attaching a tracker to his car, that's not quite the standard.  Because probable cause "deals with probabilities, not certainties," *People v. Altman*, 960 P.2d 1164, 1171 (Colo. 1998), the affidavit needed to establish only "a fair probability" that installing a GPS tracker on Eastman's car would lead to evidence of criminal activity. *Green*, 70 P.3d at 1214 (emphasis and citation omitted); *see also People v. Gutierrez*, 222 P.3d 925, 937 (Colo. 2009) ("At the margins, probable cause requires 'less than evidence which would justify condemnation or conviction . . . .'" (citation omitted)).

¶ 27     Because the affidavit here did that, we affirm the denial of Eastman's motion to suppress.[3]

### III.   Other Act Evidence

¶ 28     Eastman next contends that the district court reversibly erred by admitting "irrelevant and highly prejudicial" evidence of other acts of domestic violence between himself and Frank.  We are not persuaded.

### A.   Additional Background

¶ 29     Before trial, the prosecution sought to introduce evidence of several incidents of domestic violence between Eastman and Frank under section 18-6-801.5(3), C.R.S. 2025, and CRE 404(b).  The prosecution also filed a motion to introduce Frank's statements about some of the incidents under CRE 807, the residual exception to the hearsay rule.  Eastman objected to both motions.

¶ 30     After a motions hearing, the court found that the prosecution had satisfied its burden to show that "such acts did occur," that the acts were admissible under Rule 404(b) and section 18-6-801.5(4),

---

[3] Because we conclude that the affidavit established probable cause, we don't address the People's alternate argument under the good faith exception.

and that the statements Frank made to others about the incidents were admissible under Rule 807. It therefore permitted the prosecution to admit the other acts to establish Eastman's "motive and intent" and to provide context to "Eastman's attitude, threats and behavior towards Frank."

¶ 31 At trial, Frank's adult son told the jury that in 2014, Eastman sliced Frank's neck (leaving a scar), broke her wrist, and hit her in the face (leaving noticeable bruising). And he described an altercation in 2015 where he saw Eastman put Frank in a "choke hold"; when he tried to free his mom, Eastman punched him three times in the head. He also testified that Frank told him in 2019 that Eastman had strangled her, she feared Eastman, and she wanted help.

¶ 32 Other witnesses shared similar stories. One of Frank's longtime friends testified that Frank told her that Eastman would "put his hands on her and get physical," she was scared to leave him, and it "would be dangerous" for her. The friend also testified that she saw "bruises on [Frank's] arm, on her wrists, [and on] her neck" on numerous occasions and once saw her arm in a sling. A male friend of Frank's testified that, in 2019, Frank told him that

Eastman was abusive and that she feared for her safety. And this friend told the jury about the threatening messages Eastman sent him after he had tried to help Frank. Frank's hairdresser testified that in 2019 she noticed a bald spot on Frank's head, marks on her neck, and a bruise on her arm. Frank told her that Eastman had yanked her hair out and strangled her.

¶ 33    Before each witness testified, and again before the jury deliberated, the court instructed the jury on the limited purposes for which the evidence could be considered.

### B.    Legal Principles and Standard of Review

¶ 34    Evidence of other crimes, wrongs, or acts is not admissible "to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." CRE 404(b)(1). But such evidence may be admissible for another purpose, such as to prove motive or intent. CRE 404(b)(2).

¶ 35    When — as here — the other acts involve acts of domestic violence against the same victim, the evidence is generally considered "helpful" and "necessary" to establish, among other things, the "escalating levels of seriousness" of the domestic violence. § 18-6-801.5(1); *see also People v. Cross*, 2023 COA 24,

13

¶ 22 (noting that in enacting section 18-6-801.5, the legislature "placed its finger on the scale in favor of admitting evidence of prior acts of domestic violence in prosecutions involving domestic violence").

¶ 36    To be admissible under Rule 404(b) and section 18-6-801.5, the court must first determine, by a preponderance of the evidence, that the other acts occurred and that the defendant committed the acts. *People v. Vasquez*, 2022 COA 100, ¶ 74.

¶ 37    If the court so finds, it then must decide whether the other act evidence satisfies the four-part test in *People v. Spoto*, 795 P.2d 1314, 1318 (Colo. 1990). *See Vasquez*, ¶ 75. Under *Spoto*, other act evidence is admissible only if (1) it relates to a material fact; (2) it is logically relevant; (3) the logical relevance is independent of the prohibited inference that the defendant acted in conformity with his bad character; and (4) the probative value is not substantially outweighed by the danger of unfair prejudice. *Spoto*, 795 P.2d at 1318.

¶ 38    We review the admission of other act evidence for an abuse of discretion. *People v. Lancaster*, 2022 COA 82, ¶ 37. A court abuses its discretion "when its ruling is manifestly arbitrary, unreasonable,

[or] unfair," or when it is "based on an incorrect understanding of the law." *People v. Owens*, 2024 CO 10, ¶ 105.

### C. The Offer of Proof Was Sufficient

¶ 39　Eastman first argues that the prosecution's offer of proof "was insufficient" to show that the other acts occurred.

¶ 40　A district court must apply the preponderance of the evidence standard to determine whether it is more likely than not that the other act occurred. *See People v. Garner*, 806 P.2d 366, 372 (Colo. 1991). But a court isn't required to hold an evidentiary hearing to make that determination. *People v. Moore*, 117 P.3d 1, 3 (Colo. App. 2004). Rather, a court may determine the admissibility of other act evidence based on an offer of proof. *Id.*; § 18-6-801.5(3) (allowing proponent of other acts of domestic violence to "advise the [district] court by offer of proof of such evidence"); *see also People v. Groves*, 854 P.2d 1310, 1313 (Colo. App. 1992) (noting that an evidentiary hearing was not required where parties had opportunity to present offers of proof as to other act evidence).

¶ 41　The prosecution submitted a detailed offer of proof about the other act evidence that it intended to introduce at trial. Some of the previous incidents had resulted in police involvement and criminal

charges. The offer of proof also included corroborating information, including from persons who either independently witnessed some of the other acts or saw physical evidence of abuse consistent with the described acts.

¶ 42 And in addition to the offer of proof, the court considered Eastman's admissions in his police recorded interview that the parties had a volatile relationship and that Eastman had physically abused Frank in the past.

¶ 43 Based on this, we can't conclude that the court abused its discretion by finding that the offer of proof was sufficient to satisfy the prosecution's burden to show that it was more likely than not that the other acts happened.

### D. Evidence of Other Acts of Domestic Violence Against Frank Was Properly Admitted

¶ 44 Eastman argues that the other act evidence satisfied none of the *Spoto* prongs because the prior acts were not substantially

similar to the charged crime and some acts were more remote in time.[4] We disagree.

¶ 45 First, Eastman doesn't dispute that motive and intent are material facts and that it's well established that other acts of domestic violence against the same victim are admissible to prove motive, intent, and culpable mental state. *See, e.g., Cross*, ¶ 76 (evidence of the defendant's prior acts of domestic violence against the victim were admissible to prove motive, intent, and lack of accident); *see* § 18-6-801.5(1) ("[D]omestic violence is frequently cyclical in nature, involves patterns of abuse, and can consist of harm with escalating levels of seriousness.").

¶ 46 Second, because the other act evidence was relevant to prove that Eastman was motivated to use violence to control Frank and that he acted intentionally when he killed her, we reject Eastman's related claim that the purported lack of similarity makes the other

---

[4] Eastman treats all the evidence together and argues that the prior acts are dissimilar and remote. But he never addresses or acknowledges section 18-6-801.5, C.R.S. 2025, or its declaration concerning the cyclical nature of domestic violence. Nor does he account for the fact that the other acts include incidents during the troubled relationship, some of which were closer in time to Frank's murder.

acts not logically relevant. *See People v. Torres*, 141 P.3d 931, 934 (Colo. App. 2006) (noting other acts of domestic violence against the victim were logically relevant because they "had a tendency to show that it was more probable that [the defendant] intended to commit [the charged crimes]").

¶ 47 Third, the logical relevance of Eastman having abused Frank in the past was independent of the intermediate inference that Eastman had a bad character. Though not identical, the acts of violence against Frank during their relationship were relevant to show his motive to control her, to rebut his defense that someone else (with no known motive) killed her, and because they made it more likely that he intended to kill her. *See People v. Fry*, 74 P.3d 360, 371 (Colo. App. 2002) (the logical relevance of evidence of other acts of domestic violence — that the defendant intended the consequences of his actions — was independent of a bad character inference), *aff'd*, 92 P.3d 970 (Colo. 2004).

¶ 48 Fourth, we are unpersuaded by Eastman's contention that the other act evidence was unfairly prejudicial and "served no purpose" other than to inject "collateral issues" that were likely to confuse the jury. "[U]nfair prejudice . . . does not mean prejudice that

18

results from the legitimate probative force of the evidence." *People v. Rath*, 44 P.3d 1033, 1043 (Colo. 2002). Given Eastman's claim that he did not kill Frank, the other act evidence was significantly probative of his motive and intent to kill her. Yet it was far less inflammatory than the charged crimes, so it had little chance of swaying the jury to render a decision on an improper basis. *See Cross*, ¶ 26 (evidence of other acts of physical and emotional abuse of the victim was not unfairly prejudicial and was probative to suggest that the defendant intentionally shot the victim). The court also minimized any prejudicial effect through the repeated and explicit limiting instructions that prohibited the jury from concluding that Eastman "is guilty . . . based on a belief" that he "has bad character or a tendency to commit bad acts."

¶ 49 We conclude that the district court did not abuse its discretion by admitting the other act evidence under Rule 404(b) and section 18-6-801.5.

### E. The Residual Hearsay Exception

¶ 50 Eastman next argues that even if the other act evidence was admissible under *Spoto*, the court erred by admitting it because some of the evidence included statements by Frank, and he argues

that those statements "were largely (if not entirely) devoid" of any guarantees of trustworthiness.

¶ 51    We review hearsay rulings for an abuse of discretion. *People v. Sparks*, 2018 COA 1, ¶¶ 35-36.

¶ 52    Under the residual hearsay exception, an out-of-court statement that isn't covered by other exceptions is admissible if the statement has "equivalent circumstantial guarantees of trustworthiness" and a court determines that

> (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

CRE 807.  The proponent must establish the trustworthiness of the statement by a preponderance of the evidence. *People v. Thompson*, 2017 COA 56, ¶ 155.

¶ 53    To evaluate the trustworthiness of a statement, a court examines "the nature and character of the statement, the relationship of the parties, the probable motivation of the declarant

20

in making the statement, and the circumstances under which the statement was made." *Id.* (citation omitted).

¶ 54     Considering these factors, we reject Eastman's contention that Frank's statements to family and friends were devoid of any guarantees of trustworthiness. Indeed, Eastman doesn't dispute that Frank's statements were made spontaneously to family and friends, they were not self-serving, and Frank had no motive to lie about Eastman's abuse. *See People v. Fuller*, 788 P.2d 741, 745-46 (Colo. 1990) (concluding that the victim's statements were supported by circumstantial guarantees of trustworthiness because they were "spontaneous statements" to "close friends that she had known for many years," they were "not self-serving," and she "had no motive to lie"). Beyond that, Frank had personal knowledge of the abuse and several of the witnesses personally observed corroborating signs of abuse such as bruising, missing hair, and other physical marks.

¶ 55     Finally, to the extent Eastman suggests that the admission of Frank's statements to family and friends violated his constitutional confrontation rights, he doesn't claim that the statements were testimonial. And nontestimonial statements do not implicate a

defendant's right to confrontation. *Nicholls v. People*, 2017 CO 71, ¶¶ 30-33.

¶ 56 For these reasons, we conclude that the district court acted within its discretion by admitting Frank's statements to family and friends about Eastman's abuse under Rule 807.

IV. Disposition

¶ 57 The judgment of conviction is affirmed.

JUDGE HARRIS and JUDGE MOULTRIE concur.